# McCaskey *versus* Graff.

1. Where a person has been guilty of *actual fraud* in the purchase of real estate at sheriff's sale, he is not entitled to be reimbursed what he paid for it.

2. It is not a valid objection to the competency of a witness that he is a creditor of one who is a surety for a debt which the debtor's estate would be able to pay in the event of a recovery in the suit trying; the interest is too remote.

3. Where declarations of the defendant are given in evidence to show that a fraud was practised by him in connexion with another and for their joint benefit, the declarations of such second person, made either before or after the sale, concerning the purchase, its purpose and object, are admissible against the defendant in order to show the fraud committed.

4. Where it appears from the bill of exceptions that a witness was rejected on account of interest, it will be presumed that the rejection was proper where the contrary does not appear from the record.

ERROR to the Common Pleas of *Lancaster county*.

This was an action of ejectment, to November Term, 1852, by David Graff, assignee of John M. Downey, *v.* William McCaskey and Adam Ellet. The defendants in some way held under Robert A. Evans.

In December, 1851, Robert A. Evans purchased at sheriff's sale a tract of 88 acres of land in Leacock township, which had been duly levied on as the property of John M. Downey, for the sum of $4450; and, on the 27th day of May, 1852, having paid the whole of the consideration-money, he received the sheriff's deed therefor, and afterwards put the defendants, McCaskey and Ellet, into possession.

This action of ejectment was brought by the voluntary assignee of Downey, for the benefit of his creditors, to recover the said land, alleging that the sheriff's deed to Evans was void, the purchase by him having been made at an under value, in consequence of fraudulent misrepresentations made by him at the sale which induced other persons not to bid.

To sustain the allegation of actual fraud, Job P. Barefoot was called on part of the plaintiff. He was objected to on part of the defendants on the ground of *interest*. There was discrepancy in the statement, by the adverse counsel, as to the facts, but they were probably as follows: Barefoot, the proposed witness, had a

VOL. XI.—41

judgment against *Jane* Downey and H. A. Hestin for $1042.
A previous judgment had been obtained in favor of J. J. Morrison
against John M. Downey and Jane Downey, for $243.19, in which
*Jane* Downey was the surety of John. It was before the judgment
of Barefoot. Either the real estate of Jane had been sold, on a
judgment for a debt of John, or she had left but a small piece of
land containing about four acres. On an execution on Morrison's
judgment, the land in dispute had been sold, but the proceeds did
not reach to pay Morrison's judgment. It was however alleged,
that if the plaintiff in this suit recovered, the judgment of Mor-
rison would be paid out of the property of John, and the real
estate of Jane Downey would be released from Morrison's judg-
ment; or, that she might be entitled to subrogation under the
judgment of Morrison against the property of John Downey.

Barefoot was admitted, and exception was taken. This was the
first bill of exceptions.

Barefoot testified that R. A. Evans said, at the place of sale,
after the conditions of sale had been read, that *he and his brother*
had agreed to buy the property for the old lady (Mrs. Downey)
and daughters—that he said, "we are to buy it for them, and they
are to secure me." It appears he held a judgment binding the
property.

Barefoot said that he did not bid, because, when he came to the
place of sale, he understood that the property was to be purchased
by Evans for the family.

The *second* bill of exceptions was taken to the admission of the
testimony of Henry Eckert, offered "to prove that *Walter* Evans
said that he and his brother, R. A. Evans, had bought the pro-
perty together; to be followed by other evidence of what *Walter*
Evans said with regard to the purpose for which it was purchased."
This testimony was objected to on part of the defendants, was ad-
mitted by the Court, and exception was taken.

The *third* bill of exceptions was to the admission of the testi-
mony of James C. Dunlap, by whom the plaintiff offered to prove
"that the witness saw Walter Evans before the sale, and that he,
Walter Evans, told witness that Robert Evans intended to buy the
property for the family of John M. Downey: and that in conse-
quence thereof witness did not go to the sale and bid, as he in-
tended." This testimony was objected to on part of defendants;
was admitted by the Court, and exception was taken.

The *fourth* bill of exceptions was to the rejection of *Walter
Evans* as a witness for *defendant.* It was stated on the paper-book
that he was rejected by the Court as interested, on the testimony
of Henry Eckert and James C. Dunlap, mentioned in the previous
bills of exceptions, as to conversations with Walter Evans. In
the bill of exceptions it was stated that he was "objected to by

[McCaskey v. Graff.]

plaintiff." "Disallowed on account of interest." Exception was taken to his rejection.

It was proved on the trial that Robert A. Evans paid to the sheriff the whole consideration of $4450: that the money was paid into Court and distributed by an auditor among the lien creditors of John M. Downey in the order of their liens. On part of defendants it was contended that if the jury found for the plaintiff it ought to be on condition that he reimbursed to R. A. Evans the amount so paid in relief of the trust.

The Court, however, charged the jury that should they come to the conclusion that *actual fraud* had been committed, their verdict should be for the plaintiff without annexing any condition. ,

June 11, 1853, verdict for plaintiff.

Exception was taken to the charge; and the ruling of the Court, as complained of in the several bills of exception, was assigned for error.

*E.* and *T. E. Franklin,* for plaintiff in error.—In relation to the admission of Barefoot, it was said that Barefoot's judgment against Jane Downey was a lien on' a small tract of about four acres of land belonging to Jane. That Morrison's previous judgment bound it—and that if a recovery were had in the suit trying, Morrison's judgment would be satisfied out of the property of *John* M. Downey, and thus Jane's property would be relieved, and might, to the extent of its price, be applied to Barefoot's judgment, and thus Barefoot was interested. It was said in the oral argument that if Morrison's judgment were paid out of the land, Barefoot, in right of Jane Downey, would be entitled to subrogation under the judgment of Morrison against *John* Downey. Cited 6 *Barr* 398; 10 *Id.* 167; *Greenleaf's Ev.* 390–392.

As to the 2d and 3d exceptions, it was said Walter Evans was not a party, and the evidence was hearsay.

As to the 4th was cited 7 *Harris* 321, Walker *v.* Coursin.

As to the 5th exception, it was contended that it would be against equity to require a forfeiture of the amount paid for the land. Cited *Francis' Maxims in Equity* 4; 2 *Atk.* 133; *Id.* 296; 2 *Ves. Sen.* 516; 2 *Cowen* 138; 1 *Woodbury & Minot* 195; 11 *Wheaton* 103; *Id.* 126; 6 *B. Monroe* 120; 1 *Merivale* 643.

*Fordney, Frazer,* and *Stevens,* with whom was *Ellmaker,* for defendant in error, plaintiff below.—It was stated that Jane Downey had no real estate on which Barefoot's judgment was a lien. Barefoot's judgment was amongst the last of the judgments against John M. Downey. But if it were reached and paid by a resale, and Jane Downey, if she were a surety, were subrogated, Barefoot might not have any control of the fund. He had

no lien on it. She might or might not pay it to him; or her right of subrogation might be attached by another creditor.

Evidence was given of combination between the two Evans's: 8 *Barr* 64.

As to the last point as to forfeiture, it was said that the cases cited on part of plaintiff in error, were cases of *legal* and not of actual fraud. If *actual fraud* exists, the sale is *void*—has no existence as a means of conferring title: Gilbert *v.* Hoffman, 2 *Watts* 66; 4 *Johns.* 598; Smith *v.* Loader, *Prec. in Ch.* 80; 7 *Ser. & R.* 230, Riddle *v.* Murphy; 1 *Harris* 359, Jackson *v.* Summerville; 5 *Barr* 216; *Story's Eq.* 193.

*T. E. Franklin,* in reply.—It was contended that if even actual fraud existed, the money should be refunded so far as it has gone to the relief of the adverse party. That equity is satisfied by placing the party injured in the condition in which he was before.

The opinion of the Court was delivered by

BLACK, C. J.—It is not denied that the title by which the plaintiff below claims the land was originally good. But the defendant asserts that it passed to him by a sheriff's sale; and so it did, if his purchase was an honest one. This was the matter of fact contested before the jury.

The plaintiff offered one Barefoot as a witness, to whom the defendant objected on the ground of interest. It was not asserted that he had a direct interest in the record, or that the judgment in this case could be used as evidence for or against him in any future suit to which he might become a party. But it was shown that he was a creditor of Jane Downey, and that Jane was the surety of John Downey for a debt which John would be able to pay if his assignee recovered in this case; otherwise Jane would be compelled to pay the debt and her property would be so far exhausted that the witness's debt would probably not be realized. If his character did not put him above the suspicion of being influenced by a mercenary motive in giving his testimony, the relation he bore to the subject was a fair argument to the jury against his credibility. But it was entirely too remote an interest to exclude him.

Robert Evans was the purchaser at sheriff's sale, and seems to have defended the cause as the real party. The defendants on record were probably his tenants. Certainly they hold from him in some way. It is charged that he got the property knocked off to him at an under price, by falsely giving out that he was buying it for the family of the defendant in the execution, and by fraudulently pretending that the purchaser would take it charged with certain liens which he knew the sale would divest. There is some evidence from his own mouth that this trick was practised (if prac-

[McCaskey v. Graff.]

tised at all) by him and his brother Walter together, and for their joint benefit. Under these circumstances, it was not error to admit evidence of a statement made by Walter, which prevented bidders from going to the sale, or his declarations afterwards concerning the purchase, its purpose and object. The words of a co-conspirator, as well as his acts, can always be proved when uttered in furtherance of the common design. His subsequent admissions were rightly received for another reason, namely, because if he and Robert bought the property together, (as Robert had said,) he was a party in interest.

Walter was himself offered as a witness in favor of his brother. The bill of exceptions contains but this: "Walter G. Evans objected to by plaintiff, Mr. Stevens—disallowed on account of interest." The presumption is that the Court was right. We make every intendment in favor of a judgment. It was the business of the Court to find and decide the fact of interest or no interest, and we cannot suppose they did so on insufficient evidence, when the bill of exceptions does not show it. This alone would decide that the judgment could not be reversed on that ground. But from what I have said before, our opinion will be readily inferred that the witness had such an interest as would render him incompetent. The defendant has probably lost nothing by leaving his bill imperfect.

But the great point in this cause, which really goes to the root of it, is raised by that part of the charge in which the jury were instructed to find an unconditional verdict for the plaintiff, if they believed there was actual fraud in the defendant's purchase. The defendant thinks he has a right to hold the land until he is reimbursed what it cost him, no matter how fraudulent his conduct was.

In the case of a purchase, honest in itself but forbidden by a rule of policy, the legal fraud cannot be taken advantage of without a tender of the purchase-money. Thus, an attorney who buys a title on which he has been consulted, without the consent of his client, may hold it until he is reimbursed what he paid for it (3 *W. & Ser.* 486). The same rule applies to all sales which are unobjectionable except for the fiduciary relation borne by the purchaser to the other claimant. It is also true that where a party goes into chancery to be relieved against a hard bargain which has been extorted from his folly, his weakness, or his necessities, but which he made with his eyes open and without being influenced by any positive deception of the other party, the relief will not be given until he who seeks it surrenders all the advantage he has derived from the agreement. He must do equity before he can ask it. Thus, one in remainder sold an estate which was to fall in upon the death of a tenant in tail, turned of fifty and not likely to marry, for a sum not greater than a single year's purchase. Lord

[McCaskey *v.* Graff.]

HARDWICKE declared it a catching bargain against a necessitous and improvident heir, and set it aside, but decreed the plaintiff to pay back the sum he had received (2 *Atk.* 133). Where £1000 had been assigned to an attorney for fees, by a weak and intemperate woman, there being no proof of deception the attorney was allowed his just claim and no more (2 *Atk.* 296). A defendant in an execution, driven to the wall by the oppressive rigor of his creditor, and seeing his property about to be sold at an enormous sacrifice, consented to give a bond and mortgage for his own debt and that of his insolvent son besides. It was decreed that the bond and mortgage should stand for the amount of the execution only (2 *Cowen* 138). The assignment of a sailor's share of prize money at a great under value, was set aside upon paying the sum actually received by the assignor (2 *Ves. Sr.* 516). A deed was ordered to be cancelled on account of the grantor's mental imbecility; but the master was directed to take an account between the parties and allow certain advances made by the grantee (11 *Wheat.* 103). In none of these cases was there any actual fraud. They were all hard bargains—hard not because they were procured by deception, but on account of the gross disparity between the thing given and the price paid. The last mentioned might seem at first blush to lie outside of the rule; but the weakness of the grantor does not seem to have been imposed upon; and though the Court speaks of the grantee's conduct as improper, it is not pronounced to be fraudulent. The contracts were all sound in law. It required the intervention of a chancellor to dissolve them, and he could do it only upon terms which would place all parties in their original condition.

But we thought it was settled in Pennsylvania, if not in every other civilized state, that a title procured by means of an actual fraud or a plain and positive deception, was tainted through and through, destitute of all validity, and utterly void in law as well as in equity. Certainly it has been so decided very often here and elsewhere; and though we have examined all the cases cited on the argument, from books within our reach, we have found none in which the proposition is denied by any Court. Gilbert *v.* Hoffman (2 *Watts* 66), ruled the very point now before us in a case precisely like this. Jackson *v.* Summerville (1 *Harris* 359), decides the principle with equal clearness. In Riddle *v.* Murphy (7 *Ser. & R.* 230), the Court, speaking of one who had purchased at a sheriff's sale under a fraudulent judgment to which he was himself a party, said, "in his character of purchaser he could not claim to be reimbursed, for if the sale was fraudulent it was a nullity."

To say that a void title can stand as security for purchase-money, advances, or anything else, is a contradiction in terms. It falls like an empty sack, because it has nothing to support it and cannot support itself. The proposition that one who is detected

[McCaskey v. Graff.]

in a cheat by which he has acquired no title, shall, nevertheless, be placed on the footing of one who has a good title, unless the money he expended in the perpetration of the fraud be paid to him by the injured party, shocks our sense of right as much as it violates the analogies of the law. I am content, however, to leave the justice of the rule to the ample vindication of it given by Chief Justice KENT in Sands v. Codwise (4 Johns. Rep. 597).

We are of opinion that if the plaintiff was entitled to recover at all, it was on the ground of fraud—not fraud by construction of law, but actual fraud—and, therefore, he was not bound to tender the purchase-money before trial, nor take a conditional verdict by which he would be compelled to pay it afterwards. There being no error in the charge, nor in the ruling of evidence in or out, the verdict is of course conclusive on the facts, and the judgment must be affirmed.

Judgment affirmed.

LOWRIE, J., dissented.