# A. WASHMOOD v. UNITED STATES.

## No. A-1210.   Opinion Filed November 12, 1913.

### (136 Pac. 184.)

1.   **COURTS—Jurisdiction—Crime Committed Before Statehood.** The district court has jurisdiction to try a defendant for a crime committed prior to statehood, where the defendant was indicted prior to the erection of the state.

2.   **TRIAL—Transfer of Cause—Seal—Waiver of Objections.** (a) In transferring a case from a place of holding court in the Indian Territory to another place in the same district, it is not necessary for the seal of the court to be attached to the certificate of transfer.

      (b)   By making a motion to change the venue, defendant waives the right to raise the question that no seal was attached to the certificate of transfer.

3.   **EVIDENCE—Testimony at Preliminary Hearing—Admissibility.** Testimony given at a preliminary hearing is admissible upon proper proof of the death of witness.

4.   **TRIAL—Instructions—Reasonable Doubt—Cure of Error.** For instruction held not entirely correct but insufficient to reverse judgment, see opinion.

5.   **SAME—Instructions—Burden of Proof—Cure of Error.** An instruction which says: "If you find from the evidence that the defendant, A. Washmood, was not present at the scene of the killing of the said Ben Collins, or that he did not aid, abet, encourage, and advise the taking of the life of said deceased, or if, after a careful consideration of all the evidence, facts, and circumstances in the case, as disclosed upon the trial, you entertain a reasonable doubt as to the killing, and as to his having aided, abetted, encouraged, and advised its commission, then you should acquit said defendant, and return a verdict of not guilty"—held error, as placing the burden of proof upon the defendant, and requiring him to prove his innocence. The error in this respect was not cured by other instructions in the usual form as to the "presumption of innocence" and "reasonable doubt."

6.   **HOMICIDE — Conspiracy — Evidence — Sufficiency — Admissibility—"Conspiracy."** (a) Testimony reviewed and held insufficient to constitute a conspiracy.

      (b)   Testimony that certain parties who were indicted with the defendant had been hanged by a mob held inadmissible.

      (c)   A conspiracy is a combination between two or more parties to do a thing criminal or unlawful in itself, and may be proven by facts and circumstances if sufficient, and, when shown to have existed, then the statements and acts of each of the conspirators made or done in pursuance of the common design may be proven against the others upon a prosecution against them for the commission of the crime; but nothing said or done

by them after the crime has been accomplished is admissible. Certain declarations and acts held not to be made in pursuance of the common design, and therefore not admissible.

*Appeal from District Court, Carter County;*
*George W. Clark, Assigned Judge.*

A. Washmood was convicted of murder, and appeals. Reversed and remanded.

The plaintiff in error, A. Washmood, was on the 17th day of October, 1906, indicted by grand jury in the southern district of the Indian Territory, at Ada, charged in eight counts with conspiracy to murder and with the murder of one Ben Collins. J. B. Miller, Henry Pruitt, Clint Pruitt, and Dan Sie were jointly indicted with plaintiff in error. It was alleged in said indictment that the crime was committed August 1, 1906, in the southern district of the Indian Territory, being in what is now known as Johnston county, Okla. Prior to said trial and upon application of the defendants the case was transferred on change of venue from Ada to Ardmore in the southern district of the Indian Territory. After the erection of the state and on motion of the county attorney of Carter county, Okla., when neither the defendant nor his attorneys were present, an order was entered transferring the case to Johnston county, for the reason that said crime had been committed in said county. The defendant, through his attorneys, made a motion to retransfer the case to Carter county, setting up in their motion that, when the change of venue had been granted from Ada to Ardmore, said motion was also to the effect that the change of venue should be granted from Tishomingo as well as from Ada, and that the court in passing upon the motion had granted the change of venue to Ardmore, and that the case should be tried there. The court sustained the motion to transfer the case back to Ardmore in Carter county, where it was tried on the 15th day of March, 1911. The defendant was convicted and sentenced to be hanged and has appealed to this court. For convenience the parties will be referred to as the state and the defendant. Judge Furman being disqualified, the Governor appointed Hon. B. B. Barefoot, as special judge, to sit in his place.

*Guy H. Sigler, R. A. Howard,* and *S. A. Maginnis,* for plaintiff in error.

*Charles West,* Atty. Gen., for the United States.

BAREFOOT, SPECIAL JUDGE (after stating the facts as above.). First. The first assignment of error is that the district court of Carter county was without jurisdiction to try the defendant for the reason that the crime with which he stood charged was one against the laws of the United States; the crime as alleged having been committed before the erection of the state. To substantiate this contention we are cited to the case of *Sill Pickett v. United States,* 216 U. S. 456, 30 Sup. Ct. 265, 54 L. Ed. 566, which has been recently decided by the Supreme Court of the United States; the same being a case which went to the Supreme Court from the Western district of Oklahoma. The Supreme Court of Oklahoma soon after the erection of the state had before it this identical question in the case of *Higgins v. Brown,* 20 Okla. 355, 94 Pac. 703. And in that case the Supreme Court held, in an opinion by Chief Justice Williams, that the state courts had jurisdiction to try cases arising before statehood. This case was followed by this court in the case of *Baker v. State,* 3 Okla. Cr. 265, 105 Pac. 379, and the Supreme Court of Oklahoma, since the decision by the Supreme Court of the United States in the Pickett case, in the case of *Coyle v. Smith,* 28 Okla. 121, 113 Pac. 944, has held that the Pickett case was not in conflict with the case of *Higgins v. Brown, supra,* and, whatever might be our individual opinions as to the ultimate decision by the Supreme Court of the United States when this exact question reaches them, we at this time follow the rule heretofore made by the Supreme Court of this state in *Higgins v. Brown, supra,* and by this court in *Baker v. State, supra.*

Second. The second assignment of error is that the seal of the court was not attached to the papers in this case when the same was transferred from Ada to Ardmore, and also when the transfer was made from Tishomingo back to Ardmore, and that therefore the court had no jurisdiction to try defendants. We do not think that this contention is sound, for the reason that

10 Cr.—8

Ada, Ardmore, and Tishomingo were all situated in the Southern district of the Indian Territory, and the same clerk was clerk at each of these places, and that it was not necessary for the seal to be attached where the transfer was made from one place to another in the same district. And, besides, the defendant made application for the transfer from both Ada and Tishomingo, and by making this transfer should not be allowed to make a technical objection which would result to his benefit. We think in making the motion to transfer he waived this irregularity.

Third. The third assignment of error relied upon by the defendant is the admission of the evidence of one Dr. Thomas, which testimony was given at the preliminary hearing. Proof being made that the witness was dead, his testimony was read at this trial. This question has been passed upon by this court against the contention of the defendant in the case of *Mendenhall v. United States,* 6 Okla. Cr. 436, 119 Pac. 594. See, also, *Mattox v. United States,* 156 U. S. 237, 15 Sup. Ct. 337, 39 L. Ed. 409. The Supreme Court of the United States, in the Mattox case, fully and completely discussed this question, giving reasons very fully as to why such testimony is not in conflict with that provision of the Constitution which gives the defendant a right to be confronted with the witnesses against him. It is useless for us to quote these reasons as they can be seen by reading that opinion.

Fourth. It is next contended by the defendant that the court erred in instruction No. 10, which is as follows:

"If the evidence, facts, and circumstances disclosed upon the trial establish to your satisfaction, beyond a reasonable doubt, that Ben Collins was murdered in the Southern district of the Indian Territory on August 1, 1906, in pursuance of a conspiracy theretofore entered into between two or more of the persons referred to in the indictment, and that the defendant, A. Washmood, prior to said murder became a party to said conspiracy, and joined in the furtherance of the common design to murder said Ben Collins, and the circumstances introduced in evidence and relied on by the state having reference to said conspiracy and murder, when taken together and as a whole, tend to show that the defendant, A. Washmood, either committed said murder, as charged, in some one of the last counts of the indict-

ment, or that he was present, aiding and abetting, or ready and consenting to aid and abet, in the commission of said crime, or that he had advised and encouraged the perpetration of said crime, although not personally present at the time of its commission, and the circumstances in evidence are not susceptible of any other reasonable conclusion or explanation than that to a moral certainty said defendant, A. Washmood, is guilty as so charged, then the requirements of the law as to the degree of proof necessary to support a verdict of guilty upon circumstantial evidence would be satisfied."

It is contended by counsel for the defendant that this instruction was so worded that it deprived defendant of his right to be acquitted, if there was reasonable doubt in the minds of the jury as to his guilt. There can be no question but that there is some merit in the contention of counsel. This instruction as it is worded has a strong tendency to confuse the question of reasonable doubt, and to tell the jury that they might convict the defendant whether they believed him guilty beyond a reasonable doubt. The reasonable doubt part of the instruction seems to refer only to the jury believing that Ben Collins was murdered beyond a reasonable doubt, and not that the defendant committed the murder, or was present aiding and abetting therein, beyond a reasonable doubt. However, if this were the only error committed in this case, this court would not reverse the case upon that ground, for the reason that in the last part of the instruction the court states that "the evidence must not be susceptible of any other reasonable conclusion or explanation than that to a moral certainty said defendant, A. Washmood, is guilty as so charged." We believe that the jury would have inferred from the last part of the charge that it was necessary to convict the defendant beyond a reasonable doubt; while we believe that the instruction is not worded as it should have been, yet this error alone would not be sufficient to reverse this cause.

Fifth. It is next contended by the defendant that the court erred in instruction No. 18, which is as follows:

"If you find from the evidence that the defendant, A. Washmood, was not present at the scene of the killing of the said Ben Collins, or that he did not aid, abet, encourage, and advise the taking of the life of the said deceased, or if, after a care-

ful consideration of all the evidence, facts, and circumstances in the case, as disclosed upon the trial, you entertain a reasonable doubt as to the said killing, and as to his having aided, abetted, encouraged, and advised its commission, then you should acquit said defendant, and return a verdict of not guilty. (Given and excepted to by defendant.)"

In our opinion this instruction was erroneous. Practically the same kind of instruction has been passed upon by this court in the following cases: *Weber v. State,* 2 Okla. Cr. 329, 101 Pac. 355; *Rea v. State,* 3 Okla. Cr. 270, 105 Pac. 381; *Clendenning v. State,* 3 Okla. Cr. 379, 106 Pac. 540. As stated by the court in the above cases, this instruction tends to put the burden of proof upon the defendant by stating:

"If you find from the evidence that the defendant, A. Washmood, was not present at the scene of the killing of the said Ben Collins, or that he did not aid, abet, encourage, and advise the taking of the life of the said deceased."

These words place the burden of proof upon the defendant, and, as stated by Judge Furman in the Rea case, *supra,* "is the exact reverse of the law. Under our system the burden of proof is on the state. The defendant is presumed to be innocent until his guilt is established by the state by legal evidence beyond a reasonable doubt, and, if the state fails to do this, the defendant should be acquitted, whether the jury believe him innocent or not."

The Court of Criminal Appeals of the state of Texas, in the case of *Johnson v. State,* 29 Tex. App. 151, 15 S. W. 647, had under consideration the following instruction:

"If you believe from the evidence that the defendant, acting either alone or in concert with Jeff Wood, did not poison Elizabeth Rucker as explained in paragraph 3, or if you believe that the deceased was poisoned by accident or by her own voluntary act, or if you believe that the deceased died from natural causes, or if you believe that the deceased was poisoned by some other person than the defendant, acting alone or in connection with Jeff Wood, then you will find the defendant not guilty."

The court says:

"We think the paragraph is subject to an exception that it requires the jury to believe from the evidence of the existence of conditions which entitled him to acquittal. It virtually requires

the jury to believe from the evidence that he is innocent before finding him not guilty, whereas, the correct rule is that the jury must presume his innocence until his guilt has been established by the evidence beyond a reasonable doubt. If the jury entertained a reasonable doubt upon the whole evidence of the defendant's guilt, it was their duty to acquit him, although they might not believe from the evidence the existence of the facts and conditions, or any of them, mentioned in said paragraph. It is true that in concluding his charge the learned judge gave the usual instruction as to the presumption of innocence and as to reasonable doubt, and ordinarily such instruction is sufficient; but in this case we do not think it was sufficient to correct and counteract the error in paragraph 5. * * * The vice of the paragraph is in requiring the jury to believe from the evidence that some one of said conditions existed in order to warrant a verdict of acquittal because thereof."

As stated by Judge Furman, in the case of *Rea v. State, supra,* after quoting from the Court of Criminal Appeals in the case of *Johnson v. State, supra:*

"It is apparent that within itself this instruction is inconsistent and contradictory. This court has held that, where the instructions on a material point in a criminal case are inconsistent, some correct, and others incorrect to the extent that they may be misleading to a jury, a conviction will be reversed" —citing *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447.

We think that the instruction given in this case was misleading; that in the first part of the instruction the court placed the burden of proof upon the defendant, and that the last part of the instruction cannot be harmonized with the first part of said instruction; that the giving of the same was prejudicial to the rights of the defendant.

Sixth. It is next contended by the defendant that the testimony of the state is insufficient to sustain a verdict of guilty. In this connection we will pass upon the admissibility of certain testimony, which was offered by the state over the objection of the defendant, and in order to pass upon these objections intelligently it is necessary to review the testimony offered in this case.

The first witness called by the state was Tom Smith, who testified that he was sheriff of Pontotoc county, Okla.; that he

saw Jim Miller and B. B. Burrell at Ada; that he saw them the last time on April 9, 1908; that they were dead at that time. It was then asked the witness:

"Q. Do you know the cause of his (Jim Miller's) death? A. Yes; he was hanged by a mob. Q. Do you know a man by the name of B. B. Burrell? A. Yes, sir. Q. Was he living or dead the last time you saw him? A. He was dead. Q. Do you know the cause of his death? A. He was also hanged by the mob."

All this testimony was introduced over the objection of the defendant. The witness then gave a description of both Jim Miller and B. B. Burrell. It is the contention of the state that this was the purpose of the witness' testimony; but it certainly seems to us, after reading the whole record in this case, that the testimony of this witness in reference to the hanging of Jim Miller and B. B. Burrell at Ada by a mob was inadmissible, and highly prejudicial to the rights of the defendant. This was the first witness placed upon the stand. Nothing at this time had been shown to connect the defendant in any way with either Miller or Burrell, and this testimony could have had but one effect at the outset of this trial, to prejudice the minds of the jury against the defendant by showing that the men who had been indicted with him had been hanged by a mob in an adjoining county. It is therefore our opinion that this testimony was inadmissible, in so far as the witness was allowed to testify to the lynching of Miller and Burrell by a mob at Ada.

Mrs. Ben Collins, the wife of the deceased, was the next witness. She testified that the defendant, Washmood, had come to their house several times prior to the killing of her husband; that her husband and the defendant had talked about insurance; that the defendant came to their house in a buggy just about sundown on Wednesday, August 1, 1906, the day of the killing; that there were two roads going from the Collins home to the little town of Emmet, one known as the East road and one as the West road; that her husband had gone to Emmet on Tuesday, and had not returned at the time the defendant was there, about sundown; that the defendant inquired of the hired man, Jasper Jones, where Mr. Collins was, and, on being told that he had

gone to Emmet, the defendant left in his buggy, going in an easterly direction toward Emmet; that about 9 o'clock on the same night she heard a buggy and team drive up fast to the front gate of their home, which was about 200 yards east of the house, and drive away very. fast; that in· a few moments she heard the repeated firing of guns; and that not less than eight shots were fired. She saw the flash of the guns, and hurried to the gate, and found her husband dead. The shots had been fired by some one. standing behind a fence near ·the gate. Her husband's face was powder burned, and he was lying on his left side, holding his pistol.

Jasper Jones, the next witness, testified that he was working for Ben Collins, and had seen the defendant at Ben Collins' on several occasions just . prior to the killing, talking insurance, and the defendant had met witness and Mr. Collins on Monday prior to the killing on Wednesday when they were peddling beef; that Mr. Collins had gotten out of the wagon, and got into the buggy and rode with the defendant, and was going with the defendant on Tuesday up about Wapanucka on some insurance business; and the witness also testified in reference to the killing in about the same manner as Mrs. Collins, and to finding shotgun shells the next morning in the corner of the fence near the gate where the deceased Ben Collins was killed.

J. D. Stephens, the next witness, testified that he lived about a mile and a quarter from Ben Collins, and on the road to Emmet; that he saw a man whom he took to be the defendant drive past his place in a buggy Sunday prior to the killing on Wednesday, and inquired the way to Ben Collins'. He came back about 11 o'clock in the morning of the same day, going toward Emmet. He also saw a man whom he took to be the same man going toward Ben Collins' house about sundown in a buggy on the day of the killing, which was about 7 o'clock. Somewhere about three-quarters of an hour after this he saw this same man in a buggy pass by his house, going toward Emmet; that there was only one man in the buggy, nor was there any one near him. He also testified that he heard the shots fired about 9 o'clock in the direction of Ben Collins' house. He also testified to hear-

ing a buggy pass his house after the shooting, and to his best opinion there were two men in the buggy.

Henry Whatley testified that he lived three or four miles from Ben Collins' place, and after the killing stayed there all night; that the next morning he saw shotgun shells and tracks near the scene of the killing.

Lee Dunn testified that on the evening of the killing he passed two buggies about sundown about 200 yards from the witness J. D. Stephens' house, one being driven by a man whom he believed to be the defendant, and the other by a man whom he afterwards believed to be Jim Miller; he had never seen either of them before, and only saw Miller at Ada after he was dead; that the buggies were about five steps apart; and that the defendant was in the front buggy. It will be noted here that these buggies were at this time, according to the witness, within 200 yards of J. D. Stephens' house, yet Stephens testifies that there was only one buggy passed his house, in which the defendant was driving, and that he saw this buggy pass back about the time it would have taken to have gone to Collins' house. The testimony of this witness seems to be in direct conflict with the testimony of the witness Stephens.

Willie Stephens testified that on the night of the killing he was staying at George Turnbull's home near Ben Collins' farm; that he heard the firing of the guns about 9 o'clock in the direction of Ben Collins', and that in about 30 or 40 minutes he heard a buggy pass the Turnbull residence; that two men were in the buggy, whom he heard talking. The men were traveling fast, and ran into a treetop that had fallen across the road. He also testified to tracking a team the next morning.

James Vaughn also testified to being at George Turnbull's house on the night of the killing, and he heard the buggy pass after the shooting with two men in it. Mrs. Little Vaughn, the wife of the witness James Vaughn, testified to the same facts as her husband.

W. G. Jones, a deputy marshal, testified to going to the scene of the killing on the morning after it occurred, and to finding what he described as two ambushes near Ben Collins' house,

and to tracking a team near one of these ambushes. He testified that one of the horses had a nick out of its right hind foot, which compared with the description of the horses driven by the defendant, Washmood, on the day of the killing. He also testified to finding the saddle and bridle taken from the horse Ben Collins was riding on the night of the killing.

James H. Bridges, deputy marshal, testified to tracking horses and buggies near the scene of the killing, and that he heard the defendant say the next morning at Tishomingo that he was not around Ben Collins' on the day of the killing.

P. W. Martin testified to working at a livery stable in Tishomingo, and that the defendant hired a certain team from him on the day of the killing, and that one of the horses had a nick out of its right hind foot.

Mrs. Allie Armstrong testified that she was running a hotel at Tishomingo, and that the defendant stayed at her hotel the night before the killing, and engaged a room for Wednesday night for himself and two friends, and that he did not stay there.

James H. Bridges, on being recalled, testified to finding a paper, a Daily Ardmoreite, dated July 26, 1906, and also a brown hat in the woods near the road not far from the killing, and also finding some cans and a can of peaches about ten feet from the road.

L. W. Pearson testified that he was a salesman in a general merchandise store at Emmet, and that he sold the defendant some canned goods a few days before Ben Collins was killed. He did not remember just how long, but identified the cans offered in evidence as being the cans sold to the defendant.

George Dunn testified to seeing two men by the side of the road eating canned goods on the morning before Ben Collins was killed in the evening. He could not identify them, and could not testify that the defendant was one of them.

Wiley Melton testified to being city marshal at Tishomingo, and arresting the defendant the morning after the killing, and that the defendant told him he had not been to Ben Collins', and that the defendant was wearing a straw hat.

C. D. Latham testified to seeing the defendant in a buggy on Monday before the killing, and that the defendant asked him the way to Bee.

Luther Horton testified to seeing the defendant pass his house in a buggy the day before the killing, going toward Emmet. He also testified to seeing a man whom he took to be Jim Miller in a buggy near Ben Collins' on the morning of the killing.

E. R. Peachland testified that he was a liveryman at Tishomingo, and that he met the defendant on the road in the evening of the killing going from Tishomingo toward Ben Collins' house; that the defendant told him he was going to Emmet that night, and to Bee the next morning.

Mrs. Mary Thomas testified to being the wife of the hotel keeper at Emmet; that Washmood, the defendant, stayed all night there several times prior to the killing; that two other men were there, and got supper, started away, and came back, and stayed all night; that afterwards she was told that one of them was Jim Miller. She also testified to the defendant coming to their hotel after the killing; that he drove up, and "hollered," and awoke her and her husband; that the defendant said that it was early; that the defendant put up his team, and after putting it up came into the house, and went to bed. She testified that it was after 10 o'clock when the defendant came to the hotel. She also testified that her children and another boy, who was staying at the hotel, by the name of Newt. Dugger, had gone to church that night, and had returned before the defendant arrived. It will be noted that this is in direct conflict with the testimony of her husband, Dr. Thomas, and Newt. Dugger, each of whom testified that the defendant, Washmood, had gone to bed prior to the time of the arrival of the children from church.

Lem Thomas testified that he was the son of Dr. Thomas, who ran the hotel at Emmet; that he went to church on the night of the killing, and came back about 10:30, and was awakened by the defendant, Washmood, "hollering."

Jacob L. Thompson, the next witness, testified that he was secretary to Governor Johnson; that he met a man in a buggy between sundown and dark near Ben Collins' place, and the man

asked him if he was Ben Collins. He testified that it was a slim, stoop-shouldered man, who looked like Jim Miller, who was hanged at Ada, and whom he saw after he was hanged by the mob.

Push Cheedle testified that he went to church at Emmet on the night of the killing, and after church was over he went down by a bridge near the church about 10:30 or 11 o'clock, and saw a buggy pass going toward Emmet with the horses in a gallop.

W. J. Horton testified to meeting the defendant two weeks before the killing. Washmood asked him if Ben Collins had not come that road. He also met Washmood on the Sunday before the killing, and that he was in a buggy. He also saw Jim Miller coming out of Emmet the day Collins was killed. He saw canned goods in the buggy. He also saw him a third time about sundown in that vicinity on the day of the killing. The defendant, Washmood, was not with him at any of the times. He also saw Dr. Thompson, the secretary of Governor Johnson, pass, and then saw Jim Miller pass in a buggy on the East road. He saw the deceased, Ben Collins, going towards his home, and saw Jim Miller following Collins in a buggy by himself. This was just a short while before Ben Collins was killed. He also testified to seeing B. B. Burrell about two weeks before the killing near one of the ambushes, and that he was driving a mule team.

A. P. Kirkwood testified that he owned a store at Lynn, which was about four miles south of Ben Collins' house, and across the Washita river; that on Friday before the killing he saw the defendant, Washmood, at his store; that the defendant asked him if he had seen two men during that day; that he again saw the defendant on Monday before the killing, and that he came into the store with two other men, and bought three bottles of Longhorn and some canned goods; that after drinking the parties left. And he afterwards identified one of the parties who was with the defendant as being Jim Miller, and he identified him at Ada after he was hanged; that being the only time he had ever seen him.

Vessie Hendricks testified that she was living near the witness Stephens' house, about two miles from Ben Collins', prior

to the killing; that she saw buggies at the spring near her house on Sunday, Monday, and Tuesday, and Tuesday night before the killing; that there were two men riding in the buggy. Charles Hendricks, husband of Vessie Hendricks, testified to the same facts as his wife, and also testified to hearing the buggy running after the killing.

W. F. Gilmer, the next witness, testified that he saw the defendant in Durant on Saturday or Monday before the killing. He saw him at a restaurant, and also testified that he saw Jim Miller at the same restaurant. It will be noted that the other witnesses for the state testified that the defendant, Washmood, was in the vicinity of Ben Collins' house, in Johnson county, both on Saturday and Monday prior to the killing of Collins on Wednesday, yet this witness for the state testified that he saw the defendant in the town of Durant on Saturday or Monday prior to the killing.

B. F. Phillips, the next witness, testified that he saw the defendant at a ferry on the Washita river between Ben Collins' house and the town of Lynn a few days before the killing. He also testified that two men crossed the ferry at the same time as the defendant, but that he does not believe that either of them was Jim Miller.

W. D. Graham testified that he was ferryman near Lynn, and that he saw the defendant, Washmood, several times before the killing, and also saw two other men in that vicinity at different times just prior to the killing.

Tom Campbell testified that he saw the defendant, Washmood, pass his house in a buggy, and that he inquired the way to Ben Collins' house, on Saturday, July 7th, and also saw him in a buggy going south toward Lynn on the following Sunday.

The testimony of Dr. Thomas, who was dead at the time of the trial, was read from the stenographer's report of the preliminary hearing. He testified that he was running a hotel in the town of Emmet; that the defendant, Washmood, came to his house on the night of the killing; that he arrived there about 10:15. He testified that his children came home from church after Washmood had arrived and gone to bed. He also testified

that the defendant told him that he had passed Ben Collins on the road beyond the church, and that when the defendant first arrived at his house he made some remark about it being early; and that he told the defendant that it was not early, but that it was about 10 o'clock. He also testified that the defendant seemed to be nervous, and that a brother of Ben Collins came to his house before the defendant left for Tishomingo.

W. W. Carter testified that he was in the hotel business at Madill, and that the defendant registered at his hotel on July 5th, and that the defendant, Washmood, and a man by the name of Alford registered on July 6th; that Washmood did not occupy his room on the 5th, and Alford signed for him on the hotel register on July 6th. He also testified that they had a friend there with them durnig one of the times they were there.

Fred V. Kinkaid testified that he was a court reporter; that Washmood testified at the former hearing that he had never met Jim Miller before he saw him in the Ada jail, and did not know the Pruitt boys until after the killing. George Terry testified to seeing the defendant, Washmood, and Jim Miller together several times before the killing at Tishomingo, Durant, and at Ardmore. He testified that he saw them together six years prior to that time.

N. H. Simmons testified to knowing the deceased for six or eight years and the defendant, Washmood, for eight years, and testified that he saw them come in a buggy together to Ardmore about a week or ten days before the killing.

W. E. McLemore testified that he saw Henry Pruitt and Pote Pruitt in Ardmore a day after the killing, and saw Clint Pruitt come in the next day.

Martin Cavins testified that he saw Clint Pruitt and Pote Pruitt at a picnic in Orr some time in June or July, 1906, and saw a man with them at that picnic whom he heard was Jim Miller.

Henry Davenport testified to being at the Orr picnic, and seeing Clint and Pote Pruitt, and that Clint Pruitt introduced him to a man who was with them, calling him by the name of Jack-

son, and told him that he was a mean man. This conversation was not in the presence of the defendant.

Jim Cavins testified to being at the Orr picnic along the latter part of July, 1906, and seeing Clint and Pote Pruitt, and seeing with them a tall, slender man, weighing about 150 pounds, and also saw Miller twice after that in Ft. Worth, once after he was dead, and he testified to hearing Clint Pruitt saying on the day of the Orr picnic that that fellow came there to kill Ben Collins, and he also testified that there was a picnic at Hewitt on one of the days that the picnic was held at Orr, and that Clint Pruitt told him that they would "get him" at one of the picnics. His exact testimony was: "Q. What did Clint say? A. He said— he told me that evening that that fellow came there to kill Ben Collins, is what he told me." This testimony was not in the presence of the defendant.

J. A. Cummings was the next witness, and he testified that in June before the killing he bought a bunch of cattle at a sale with Henry Pruitt; that they drove the cattle to Duncan, and while on the way he told Henry Pruitt that he ought to send Pote Pruitt to New York City for the purpose of getting certain medical attention, Pote Pruitt being paralyzed in one of his legs by a bullet, which had been fired by Ben Collins; and that Henry Pruitt made the remark that Pote would outlive the son of a bitch that shot him. "I have got a man after him that will get him. It will cost me $500; but I will gladly pay it. I have got an old Quantrell man after him." This testimony was not in the presence of the defendant, and was introduced over the objection of the defendant.

Luke Jackson testified that he saw Jim Miller and B. B. Burrell and Henry Pruitt at the Board of Trade Saloon in Ft. Worth, Tex., about a month or six weeks before the killing; that he saw B. B. Burrell introduce Henry Pruitt to Jim Miller at that time, and that Jim Miller and Henry Pruitt went into the back of the saloon, and had a long talk together.

G. P. Wallace, the next witness, testified that he saw the defendant, Washmood, at Pete Pruitt's house in October or November, 1909, and that he came into the house, and was

introduced by Pote Pruitt to the defendant as a man by the name of Johnson, of the Standard Oil Company.

Robert Homer, an Indian boy, testified that he carried the defendant, A. Washmood, in a buggy to within five miles of Waurika, in Jefferson county, and that the defendant, Washmood, got out of the buggy, and walked to the town of Waurika.

T. N. Robnett testified to seeing Clint Pruitt and possibly Pote and Henry Pruitt at the Hewitt picnic during the month of June, and that there was with them at that time Jim Miller, whom he knew well.

V. A. Niblack testified that he was United States jailor at Ardmore, and identified J. B. Miller's handwriting.

Perry Maxwell testified that he was a bank cashier, and identified the handwriting of J. B. Miller.

D. E. Becker testified to seeing J. B. Miller in Ardmore on the morning after the killing; that he came and registered at the Gilmer Hotel; and that he saw where Miller and Washmood were registered together on August and at this hotel.

A. B. Brown testified that he was on the police force at Durant, and that a man by the name of E. P. Alford, along about the 1st of July, 1906, wrote the initials "B. C." on a notebook, and told him that a man of that initials would be killed in fifteen days. He identified the notebook which was introduced in evidence.

T. W. Anderson testified that he was on the police force at Durant, and that Policeman Brown showed him a book with the initials "B. C." on it after Ben Collins was killed. He also testified that the defendant, Washmood, and Alford were in the insurance business in Durant.

This closes the testimony for the state.

The defendant, Washmood, testifying in his own behalf, said: That he was 67 years old. That he was in the insurance business, and had been for a long time prior to August 1, 1906. That he lived in the town of Durant at that time; but that he wrote some insurance in Johnston county also. That he and one E. P. Alford were partners in the insurance business, and worked together. That they wrote both life insurance and fire insur-

ance, and gave the names of several parties for whom they wrote life insurance in and around Emmet, and in Johnston county, and around Madill, prior to the killing of Ben Collins. He testified that he came to Madill near the 1st of July, and on Saturday, either the 6th or 7th of July, he went to Ben Collins' house, as testified to by the witness Tom Campbell. That he inquired the way to Ben. Collins' house, and arrived there about noon on Saturday, either the 6th or 7th of July. That he inquired of Mrs. Collins as to the whereabouts of her husband, and found out that he was away from home. He went to the town of Emmet. That he telephoned to his partner, Mr. Alford, asking him to meet him in the town of Lynn that afternoon. That he drove to Lynn that afternoon. That he thought he would meet Mr. Alford. That while there he met two other parties, who drove up in a buggy. That he had never seen these parties before, and he got into a conversation with them. That they had some whisky. That he went into the store of the witness, A. P. Kirkwood, where he bought some Longhorn, and he and these parties he met there drank this together. That when he first saw these parties he thought that it was Mr. Alford, and this was the reason for getting into a conversation with them. That he left the town of Lynn that afternoon. That he thought he would stay all night at Ben Collins' house, as his wife had told him he would be back. When he got to Ben Collins' house, he asked about staying all night, and Collins told him that he could stay at his uncle's, who lived near there. That he had plenty of horse feed. That he went to the uncle's house, stayed all night, and the next morning drove into the little town of Emmet. That during the conversation that he had with Ben Collins on the evening before Mr. Collins agreed to help him write some insurance in that vicinity, and he agreed to pay Collins for his services. This conversation occurred on Sunday morning prior to his going to Emmet. He next testified to going to Madill. and then going to his home at Durant, and after that made different trips into that section of the county in and around Emmet in connection with this insurance business. He testified that he

came to the witness Marshall's hotel on Saturday prior to the time that Ben Collins was killed. He stayed there all night. The next morning he hired a buggy and team, and went from there to see Ben Collins. He met Mr. Collins at his home, and that he and Ben Collins had several drinks together out of a bottle, which he had. That during that conversation Mr. Collins agreed for him to write an insurance policy on his life for the sum of $5,000, and that the premium on such policy would be $161.50, and that his part of the premium would be $80 or $90, and that Ben Collins promised to go with him to Tishomingo on the following Monday for the purpose of being examined preparatory to taking out said policy of insurance. That on Monday morning he hired a buggy and team, the same team he had driven before, and went to Mr. Collins' house. That when he arrived there he found that Mr. Collins was gone, and that some of his children told him that Mr. Collins had killed a breachy cow, and was down in the bottoms trying to sell it, and he drove on and overtook them. He also testified that Mr. Collins got out of the wagon, and got into the buggy and rode with him for quite a way. When they came to the Milburn road, Collins got out of the buggy, and got back into the wagon, and that he and Mr. Collins agreed to meet the next morning in the town of Emmet. That he, Washmood, drove that evening to Tishomingo, had dinner, and from there drove to Milburn, the place from where he had started. He stayed all night in Milburn, and early next morning took the same team and went to Emmet, where he found that Mr. Collins had already been, having passed there on horseback. That he transacted certain business in that community relative to collecting insurance notes, and that he had returned to Milburn, and took the train to Tishomingo, where he stayed all night and the next day until 3 o'clock in the afternoon. This was on Wednesday, the day of the killing. He hired a buggy and team from the livery stable in Tishomingo about 3 o'clock, and started towards Ben Collins' house. He stopped and collected some insurance notes on the way over there. On the way over there he met Mr. Peachland, the livery stable man, as testified to by him. He

arrived at Mr. Collins' house between sundown and dark. That he went by the witness Stephens' house, as testified to by him; but that there was no buggy near him at the time he passed there, as testified to by George Dunn. That when he reached Mr. Collins' house the hired man, Jasper Jones, told him that Mr. Collins was not there, but had gone to Emmet. That he turned around and drove leisurely toward Emmet, passing by the witness Stephens' house, as testified to by him, taking what is known as the West road to Emmet. He stated that on his way he met some man, and asked if it was Mr. Collins, and immediately saw it was not. That he went on towards Emmet, and just before getting to Emmet he met Ben Collins on horseback going towards his home. He testified to passing the church, about which the witnesses testified, but denied that he saw any one at the bridge, and denied that he got to the hotel near 10 or 10:30, but that it was near 9 o'clock. That Dr. Thomas had gone to bed himself. That he looked at his watch, and that it was fifteen minutes after 9 o'clock. That he got up early next morning, and went to Tishomingo, and left on the noon train for Ardmore. He also testified that the relations between him and Ben Collins had been very friendly. That he knew nothing of the assassination, and was not in any wise a party to it. That he had formerly gone to the Emmet neighborhood to write Ben Collins' insurance, and that as soon as he learned of his assassination he knew that it was useless for him to stay there any longer, and that this was his reason for going to Ardmore, and from there to Durant, his home. He testified that while in Ardmore he had no arrangements to meet J. B. Miller, and did not at that time know either Henry, Pote, or Clint Pruitt. That he stayed all night in Ardmore, and took the first train out in the morning to Durant. After going home he was arrested on a charge in connection with the murder of Ben Collins. After his preliminary examination in Durant he made bond, and was living in Idabel, Okla., with Capt. McGinnis, who is now one of his counsel, when he heard that some officer from Ardmore was in that country for the purpose of rearresting him. That he did not understand why this was, as he was out on bond, and he did not believe

that his bondsmen would turn him up. That acting upon the advice of Capt. McGinnis he went to Ardmore about that time, having heard that his case was set for November 16th. That he was advised by Capt. McGinnis to go to see the attorneys of the Pruitts when he got to Ardmore, and take their advice. That immediately upon reaching Ardmore he went to the office of the attorneys for the Pruitts, and they informed him that in the transfer of the case from Johnston to Carter county his bond had been lost, and was on that morning, for that reason, forfeited. That they asked him if he could at that time make bond, and he told them that he did not know whether he could or not. That the lawyers advised him that, owing to the high state of feeling in that community, and on account of the lynching of J. B. Miller and B. B. Burrell at Ada, it would be dangerous for him to be placed in jail, and that they advised him to go to see Henry Pruitt, who lived near Cornish. He testified that at first he protested against this; but on being informed of the danger of staying there he walked out to Pote Pruitt's house near Cornish. That while there he was introduced to one of the neighbors by Pote Pruitt as being a man by the name of Johnson, of the Standard Oil Company. That this party came up to where they were talking unexpectedly, and that Mr. Pruitt introduced him by that name of his own accord. That he had never seen Pote Pruitt prior to coming to his place on this occasion. That he stayed there for three or four days, and that an Indian boy carried him near to Waurika one night, and that he got out of the buggy, and walked into Waurika, and took the train for San Antonio, Tex. That he was afterwards arrested in San Antonio, and when coming to Ardmore escaped from the train. That he returned to San Antonio, and of his own accord made arrangements with a friend at Ft. Worth to accompany him to Ardmore. That he came and surrendered of his own accord, and had been in jail up to the time of this trial.

J. W. Marshall testified in behalf of the defendant that he was a hotel keeper at Emmet and Milburn; that Mr. Washmood stayed at his hotel at both places prior to the killing of Ben Collins; that it was his understanding that the defendant

was in the insurance business at that time, and that he, himself, took out an insurance policy with the defendant; that the defendant stopped at his hotel and stayed all night on Saturday, Monday, and Monday night before the killing of Collins on Wednesday, and was there Tuesday morning; that he came there Saturday evening about 1:30 or 2:00, and had late dinner; and that he was there for supper and left Sunday morning, and was back for supper Sunday night, and stayed all night there Monday night, and left, saying that he had to go out into the country on some business.

Horace Tanner testified in behalf of the defendant that he was residing at Milburn, and remembered seeing the defendant, Washmood, at the hotel in Milburn just prior to the time Ben Collins was killed; that he remembered the night Ben Collins was killed; and that he went to the hotel late that night, and saw three parties riding through the town of Milburn between 12 and 1 o'clock on horseback, coming from the direction of Ben Collins' place.

Lutie Johnson testified in behalf of the defendant to having certain insurance transactions with the defendant during the time he was in and around Emmet just prior to the killing.

Newt. Dugger's testimony, which was given at the preliminary examination, was read in behalf of the defendant. He testified that he was at Dr. Thomas' hotel on the night Ben Collins was killed; that he went to church that night, and when he returned home that the defendant's, Washmood's, coat was hanging up; and that he went to bed about 11 o'clock.

W. L. Hilton testified in behalf of the defendant that he knew the defendant, Washmood, and had known him for several years, since 1905; that he had some property near Emmet, and was building a house down there in July, 1906; that the defendant, Washmood, was writing insurance there in the country at that time; that he saw him in July, 1906; and that he had on a brown Fedora hat, as testified to by the defendant, and that the hat exhibited as being found near the killing was not the hat worn by the defendant, Washmood, at that time.

W. I. Cruce, an attorney of Ardmore, testified in behalf of the defendant, Washmood, and corroborated his testimony as to advising the defendant, Washmood, to go to Pruitt's residence, in Jefferson county, when his bond had been lost.

R. C. Edland testified that he was a merchant at Lynn, and that the defendant, Washmood, came to his store on Saturday evening and also Sunday before the killing, and was there Monday and Tuesday.

This concludes the testimony, both for the state and for the defendant.

It is the contention of the state that Pote Pruitt had been shot by Ben Collins while Ben Collins was deputy United States marshal, and, as a result of this shot, one of Pote Pruitt's limbs had become paralyzed; that for this reason Henry, Clint, and Pote Pruitt, who were brothers, had employed J. B. Miller and B. B. Burrell to assassinate Ben Collins, and that the defendant, Washmood, had also been employed by the Pruitts for the purpose of getting Ben Collins to leave his home in order to give said Miller and Burrell an opportunity to assassinate him; and this is the theory upon which this case was tried; it being the contention of the state that said Ben Collins was assassinated as a result of said conspiracy between said parties.

We have reviewed the testimony of every witness who testified in this case, for the reason that after careful consideration of the whole record we have come to the conclusion that the evidence offered by the state was not sufficient to show that the defendant, A. Washmood, entered into a conspiracy to assassinate Ben Collins, and therefore that the testimony of certain witnesses to declarations and acts of others which were not in the presence of the defendant was inadmissible. It will be recalled that certain witnesses testified to being present at the picnic at Orr and Hewitt during the month of June, 1906, at which places the Pruitt boys were present and in company with a strange man, who afterwards was proven to be Jim Miller. On each of these occasions the Pruitt boys made declarations with reference to this stranger being present there for the purpose of killing Ben Collins; also declarations of Henry Pruitt to the witness J. A.

Cummings in June, before the killing in August, that: "I have got a man after him that will get him. It will cost me $500; but I will gladly pay it. I have got an old Quantrell man after him"—also acts of Henry Pruitt, as related by the witness Luke Jackson, concerning the meeting of Henry Pruitt with J. B. Miller and B. B. Burrell at the Board of Trade Saloon in the city of Ft. Worth, Tex., about a month or six weeks before the killing. These declarations and acts were not in the presence of the defendant, and were allowed to be introduced by the state upon the theory that a conspiracy had been proven between Henry, Clint, and Pote Pruitt, and J. B. Miller, B. B. Burrell, and the defendant, A. Washmood, to murder the deceased, Ben Collins. It will not be controverted that the above statements were very damaging to the defendant, in view of the testimony of Tom Smith, sheriff of Pontotoc county, who testified to the lynching of J. B. Miller and B. B. Burrell by a mob at Ada, in an adjoining county to where the defendant was tried. But there is not a line of testimony to connect this defendant with the Pruitts prior to the Orr and Hewitt picnics, and prior to the making of said declarations. There is no testimony to connect the defendant with the Pruitt boys in any way prior to the killing of Ben Collins, yet these damaging declarations and acts of the Pruitt boys were admitted against the defendant for the reason that a conspiracy had been proven between said parties to murder said Ben Collins. We are well aware that a conspiracy can be proven by circumstances as well as by direct and positive testimony, and it is often proven in that way. But in this case there is not only no direct and positive testimony as to the conspiracy, but the circumstances proven in this case are such that after reading them one cannot come to any other conclusion than that no conspiracy existed on the part of the defendant to take the life of the deceased. The mere fact that the defendant had been seen in the neighborhood where the deceased lived and in company with the deceased prior to the killing is not sufficient to establish a conspiracy. *State v. Walker*, 124 Iowa, 414, 100 N. W. 354; *State v. Kennedy*, 177 Mo. 98, 75 S. W. 989; *Rhodes v. State*, 39 Tex. Cr. R. 332, 45 S. W. 1009; *Renner*

*v. State,* 43 Tex. Cr. R. 347, 65 S. W. 1102; *Blain v. State,* 30 Tex. App. 702, 18 S. W. 862.

A conspiracy is the combination between two or more parties to do a thing criminal or unlawful in itself, and may be proven by facts and circumstances, if sufficient, and when shown to have existed then the statements and acts of each of the conspirators made or done in pursuance of the common design may be proven against the others upon prosecution against them for the commission of the crime; but nothing said or done by them after the crime has been accomplished is admissible. And for such testimony to be admissible it must be proven, first, that a conspiracy actually existed, and the declaration made must be in pursuance of the common design. The testimony in this case does not, in our opinion, prove that a conspiracy on the part of the defendant existed, and the declarations which were admitted against him were not made or done in pursuance of the common design to murder the deceased, as the law requires.

In the case of *State v. Walker,* 124 Iowa, 414, 100 N. W. 354, a case with many points similar to the case at bar, it is said:

"We think there is another good reason why the declarations of Levich should have been excluded from the consideration of the jury. What Levich said, as testified to by the witnesses, was, in substance, that he had a grudge or grievance against Finkelstein, and that he had hired defendant to do him an injury. This declaration was not made in furtherance of the unlawful plan; * * * it was a mere narrative of a fact, made, * * * not purporting in any way to represent the defendant. The rule, as usually stated, with reference to the admissibility of the declarations of one conspirator as against another, is that such declarations are admissible only where they are made pending the conspiracy, and in furtherance of its unlawful purpose. *State v. Crofford* [121 Iowa, 395], 96 N. W. 889; *People v. Parker,* 67 Mich. 222, 34 N. W. 720, 11 Am. St. Rep. 578; *Spies v. People,* 122 Ill. 1 [12 N. E. 865], 17 N. E. 898, 3 Am. St. Rep. 320, and note, 497; *McKenzie v. State,* 32 Tex. Cr. R. 568, 25 S. W. 426, 40 Am. St. Rep. 795; *McCaskey v. Graff,* 23 Pa. 321, 62 Am. Dec. 336. It is true that in many if not all cases cited the rule as thus stated is invoked to exclude declarations made after the conspiracy had been completed or abandoned with reference to what took place while the conspiracy was in exist-

ence; but in principle the same reasons are applicable to declarations made while the conspiracy is pending, but not in further-ance of the unlawful purpose. The declarations of one con-spirator are admissible against another on the theory that each is acting for all—that is, on the principle of agency—and cer-tainly an alleged conspirator is not to be charged with statements made by another which have no relation to the carrying out of the common design. The fact appears to be that Levich made the declarations, to which the witnesses testified, in a spirit either of bravado, or, as one of the witnesses says, in a joking way, and his declarations were not taken seriously, nor did they ap-parently receive any attention until after the death of Finkelstein, when it was sought through them to connect the defendant with the crime. If these declarations were of any significance, they were much more incriminating as against Levich himself than as against the defendant. It is also to be noticed that some of the declarations to which the witnesses testified were made at a time prior to any connection or relation between Levich and defend-ant, so far as the other evidence in the case tends to establish it. Of course, declarations of Levich made prior to the forma-tion of the conspiracy, and not in furtherance of any plan with which defendant was shown to have been connected, were not admissible."

It may be contended by the state that the jury had the right to say whether, under all the testimony in this case, a conspiracy existed, and that it was a question of fact for the jury to decide under the instructions of the court. This is answered by saying that defendant was entitled to a verdict as to his guilt free from the prejudice that might reasonably arise from the introduction of the incompetent testimony referred to above. It may have been and doubtless was true that the jury would not have found the defendant guilty beyond a reasonable doubt if the declarations and acts of the Pruitt boys had not been admitted in evidence. It was probably their declarations and acts that satisfied the minds of the jurors as to the guilt of the defendant, and from the verdict rendered in this case it must have had a strong ten-dency in that direction.

The defendant in this case is strongly corroborated by the state's witnesses in many material matters in connection with this case. The testimony of the witness J. D. Stephens, to our

minds, strongly corroborated the defendant's testimony.   This witness testified that the defendant passed the witness' house in a buggy by himself on the day of the killing about sundown going toward Ben Collins' home; that in a short while he saw the defendant · drive back past the house going toward Emmet, as testified to by the defendant.   This was quite a while before 'the killing, and corroborates the testimony of the defendant.

W. J. Horton, another witness for the state, testified to seeing Jim Miller going out of the town of Emmet on the day of the killing, and that he had· some canned goods in his buggy; that there was no one with him at that time; that witness passed Ben Collins on the East road to Emmet coming from Emmet, and in just a few minutes before the killing occurred; that almost immediately after passing Ben Collins on the East road he passed Jim Miller in a buggy by himself, following Ben Collins.   This was just before he heard the firing of the guns at the gate.   This testimony is almost conclusive that Jim Miller was the man who murdered Ben Collins, and that in all probability he was assisted by B. B. Burrell, who undoubtedly was the man that the different witnesses had seen with Jim Miller at different times just prior to the killing, and who was the party who left the scene of the killing in the buggy with Miller after the shooting occurred, as testified to by several witnesses.   The testimony of this witness is almost conclusive that the defendant, Washmood, was not present and did not participate in the killing of the deceased. It may be contended that it was not necessary for him to be actually present at the time of the killing, but that he entered into a conspiracy and purposely avoided being present when the killing occurred in order to prove an alibi.   However, if this argument is made, as stated, it tends to materially strengthen that part of the defendant's testimony wherein he testified that he arrived at the town of Emmet on the night of the killing soon after 9 o'clock, and that at such time it would have been impossible for him to have been present at the killing, which occurred at 9 o'clock.   Besides this, the testimony of the state's witnesses in reference to the time that the defendant arrived at Emmet is conflicting and uncertain.   Mrs. Thomas and her son, Lem, testi-

fied that he arrived there subsequent to the time that her children and Newt. Dugger came from church. However, if he was not actually present at the time of the killing, there certainly was not any reason why he should not have arrived there at the time he stated.

After reviewing all of the testimony very carefully, we have come to the conclusion that the defendant in this case did not have that fair and impartial trial to which he was entitled under the law, and are of the opinion that this case should be reversed and remanded, and it is so ordered, and the warden of the penitentiary is ordered to deliver the defendant to the sheriff of Carter county to await the further action of the district court of Carter county.

ARMSTRONG, P. J., and DOYLE, J., concur.