### ED. RHODES v. THE STATE.

No. 1448.        Decided May 25, 1898.

**1. Murder—Evidence—Acts and Declarations of Coconspirators.**

On a trial for murder, where no prior conspiracy between the other parties and defendant to commit the homicide is established, the antecedent acts and declarations of such other parties who were connected with the homicide, done and made when defendant was not present and participating, are inadmissible as evidence against him.

**2. Same.**

On a trial for murder, where the only evidence of a conspiracy, in so far as defendant was concerned, was a conversation he had with one of his brothers about the arrest of his said brother by deceased some months before, and in which conversation one of them was heard to remark, "They seem to have it in for us, and we will have to kill some of them;" Held, this alone would not render admissible, against defendant, other acts and declarations of the other conspirators done and made when he was not present.

**3. Same—Conspiracy—Charge.**

On a trial for murder, where it is very doubtful whether the court should have charged at all upon a conspiracy, in so far as defendant was concerned, and the charge given upon its supposed existence presented the law only in an affirmative manner for the State; Held, the charge should have been carefully guarded, and

counter propositions predicated upon the nonexistence of the conspiracy should have been presented on all the issues on that line in favor of defendant.

**4. Same—Complicity in Homicide.**

Where no complicity to commit a homicide has been established, actual presence of and participation by defendant at the time the mortal blow or shot was inflicted must be shown. If defendant was absent and out of sight of the combatants when the mortal blow was struck, but upon his arrival at the scene and finding his brother mortally wounded, he struck his brother's assailant, who was also mortally wounded, a blow which was not at all mortal, he would not even be guilty of manslaughter, though he might be guilty of an assault.

**5. Same—Liability for Acts of Another—Charge of Court.**

On a trial for murder, where there were two difficulties, there being an interval of about five minutes between them, and defendant was not present at the commencement of the second, but only appeared upon the ground when both combatants in the second difficulty were mortally wounded, the fact that he had been near by and hastened to succor his brother, who was one of the combatants, did not render him actually present and responsible for all that his brother had done before he arrived or was present, no matter what his purpose was in hastening to the scene of the difficulty; and it was error for the court to charge upon the theory of a continuous difficulty and to predicate defendant's liability upon the theory of his presence during the entire difficulty.

APPEAL from the District Court of Gonzales. Tried below before Hon. M. KENNON.

Appeal from a conviction for murder in the second degree; penalty, seven years imprisonment in the penitentiary.

The important facts are fully stated in the opinion.

*Burgess & Hopkins* filed a very able and elaborate brief and argument in the case.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State. [No briefs found in the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of seven years; hence this appeal.

The indictment charged Claud Rhodes, Yearby Rhodes, and Ed. Rhodes with the murder of R. R. Coleman, by shooting him with a pistol. The circumstances attending the killing show that a state of ill feeling existed between the Rhodeses on one side and the deceased on the other, and various expressions of ill will and bitter feeling were proven to have been made by members of the Rhodes family, including Bill Rhodes, Yearby Rhodes, and Ed. Rhodes, brothers, and Claud Rhodes, the son of Bill Rhodes, antedating the homicide for several months, towards deceased. It is also shown on the part of the defendant that the deceased, Coleman, entertained ill feelings towards the Rhodeses. The homicide occurred on the evening of the 3d of November, 1896, the same being the day of the general election, in one of the most public places at Waelder. The plat of the ground shows that the killing occurred north of, and in the rear of Robertson's store. The stores of Robertson, Mrs. McCraw,

Claud Rhodes, and Tom Pool joined. Each of said stores fronted south, towards the Galveston, Harrisburg & San Antonio Railway. The store of Claud Rhodes extended back north eighty feet, and had a door and window in the north end, and a window in the east side, near the rear. Mrs. McCraw's store only ran back fifty feet, with a door and window in the rear. The store of O. B. Robertson extended back ninety feet, with a window in the west side and a door in the north end. East of Robertson's store was a vacant lot, thirty feet wide, and east of that was the store of R. L. Miller, which was on the corner, which extended back from south to north, eighty feet. There was a vacant space, or open plaza, in the rear of all these stores, where it appears on the day of the homicide a number of people were congregated. The killing occurred in the rear of Mrs. McCraw's store, and at or near the northwest corner of Robertson's store. It appears from the testimony that deceased, R. R. Coleman, was acting in some capacity as a peace officer or policeman, though the record discloses no authority on his part to act as such. The testimony shows that he made one arrest that day before dinner, and was seen carrying a man to the calaboose; and, when his authority was questioned by the Rhodeses, he stated to them that Sheriff Jones requested him to preserve the peace, and that he would arrest appellant if he cut up. It also appears that one Ham was with the deceased, Coleman, and in the difficulty acted with him. There is no testimony, however, intimating that he was an officer. The testimony showed that a crowd of people were congregated in the open plaza on the north side of said building. Bill Rhodes and several parties, shortly before the difficulty, were standing in the rear of Mrs. McCraw's store, near the cistern, engaged in conversation. While they were talking, Ed. Rhodes, the defendant, came out of the north door of the McCraw store, and started on north, pulled his hat off, waved it around his head, and said, "Hurrah for Bryan and free silver, by God!" About this time Coleman came around the north corner of the Robertson building, and went up to defendant, and took hold of him, and said, "If you don't be quiet, I will put you in the calaboose." Bill Rhodes walked up, and said, "Coleman, you are no officer, and can't arrest anybody." Coleman replied, "Sheriff Jones requested me to preserve the peace, and I will arrest him if he cuts up." Some further altercation of words ensued, and Bill Rhodes called Coleman "a half-breed Mexican son of a bitch." Coleman immediately drew his pistol, and knocked Rhodes down, inflicting a severe wound on his head, from which he bled profusely. He presently rose up, and Ham and Coleman presented their pistols on him. It seems that, besides Bill Rhodes, Ed. Rhodes and Yearby Rhodes were both present or near by. At this juncture, Mrs. Pool, the sister of Bill Rhodes, came out from the north door of Claud Rhodes' store, and she and Ed. Rhodes took hold of Bill Rhodes, and carried him into Claud Rhodes' store, entering at the north door. D. E. Johnson took Coleman by the arm, evidently to carry him off, and got in the rear of Robertson's store. As to what occurred in the store of Claud Rhodes, after Bill Rhodes was carried in there, the testi-

mony is conflicting. Some of the State's witnesses show that Claud Rhodes furnished Bill Rhodes with a pistol and got one himself. The testimony for the defendant shows that Bill Rhodes, despite the efforts of Claud Rhodes, Ed. Rhodes, and Mrs. Bill Pool, succeeded in getting the pistol. The testimony of the defense, also, tends to show that these parties endeavored to restrain Bill Rhodes and keep him in the house, but that he overcame their opposition, and as soon as he got a pistol went out at the north door. As to what happeened after Bill Rhodes got out at the north door, and before he went in the house, there is no conflict in the testimony. The evidence shows that he at once advanced towards Coleman, who was then at the rear of Robertson's store, and made some remark, and began to draw his pistol, and Coleman also drew his, and they fired at each other about the same time, and continued firing at each other until they had each fired four or five times, and had apparently emptied their pistols. They continued to snap them at each other, and then went to striking at each other. About this time Ed. Rhodes, defendant, came around the Robertson building from the front and approached from the north end. The firing at that time had ceased, and Coleman was standing at or near the north door of the Robertson building against the wall, and defendant struck him over the head with a billiard cue and knocked him down. Bill Rhodes in the meantime had fallen. Yearby Rhodes came up about this time, approaching from the west, and was trying to get at Coleman with a pocket knife in his hand, but was prevented by the bystanders. Defendant retired back the way he came; and there is some testimony that Claud Rhodes also retired the same way, with a pistol in his hand. One or two witnesses testify to seeing Claud Rhodes during the shooting at the east window of his store with a pistol, and one witness testified to seeing him fire the pistol once. But this is controverted by other testimony. It was proven by the physician that the lick struck with the billiard cue was not a fatal wound, but that deceased, Coleman, died from the effect of two gunshot wounds, one of which entered the right side in front near the nipple and ranged through the body in front, breaking the breastbone. The other entered above and to the right of the left nipple, and lodged against the skin near the backbone. He lived until the next day, and died from the effect of these wounds. Bill Rhodes lived about a week, and died from the effect of the wounds received by him.

The theory upon which the State conducted the prosecution was that the killing of Coleman was done by Bill Rhodes, and that Ed. Rhodes, defendant, was present and participated in the same, and it was a killing of either murder in the first or second degree, because it was done in pursuance of a conspiracy entered into between the Rhodes boys to bring on a difficulty and kill Coleman; that, if it was not murder, it was at least manslaughter, because the killing by Bill Rhodes was not done in self-defense, but was committed after he had received a severe wound, and had retired from the conflict, armed himself, returned, and renewed the difficulty; that, under such circumstances, the homicide would be at

least manslaughter on the part of Bill Rhodes; and that appellant, knowing his intent, participated therein, and so he was guilty of manslaughter. The case for the State was prosecuted almost entirely on the theory of a conspiracy between the Rhodes brothers and Claud Rhodes to bring on a difficulty with Coleman and kill him.

All the evidence that we have been able to cull from this record, suggesting a conspiracy, aside from the circumstances attending the homicide itself, are as follows: Some month or so before the homicide it seems that deceased, Coleman, had arrested Claud Rhodes for gambling or permitting gambling in his house. The parties had a wordy altercation about this, in which Coleman characterized the Rhodeses as a "low-down rascally set," and drew his pistol, and made Claud Rhodes retreat into his store. Bill Rhodes, who lived at Flatonia, was wired in a day or two to come up, and was seen in Claud Rhodes' store, with a pistol, and heard to remark, "I will fix the son of a bitch." A few days later than this Claud and Ed. Rhodes were heard to remark, in regard to this same matter, "They seem to have it in for us, and we will have to kill some of them." Some of the Rhodeses suggested to Glover, who was running for sheriff, that they would support him if he would promise not to make Coleman his deputy. Yearby Rhodes was also heard to express himself on one occasion to a witness that Coleman could not stay in the same town with him; and on the day before the killing he told another witness that Coleman had got a lot of whisky, and that he would get his head skinned. Another witness says that Bill Rhodes told him on the day of the homicide, directly after he got off the train at Waelder, that the boys had wired him to come up, though this is denied by appellant. On the day of the homicide, and a couple of hours before it occurred, Yearby Rhodes was heard to remark, when seeing deceased, Coleman, carrying a party to the calaboose, that he was going to get drunk, and he was not going to be as drunk as he made out, and he would see whether deceased could arrest him.

Appellant objected to all this testimony, being expressions and declarations of other members of the Rhodes family in his absence, on the ground that no conspiracy was shown either from these prior declarations and acts of the parties or from anything that occurred at and during the time the homicide was committed. We must confess that the testimony here presented of a conspiracy is exceedingly meager, if, indeed, any conspiracy is shown at all. The only conversation in which Ed. Rhodes participated was the one in which Claud and Ed. were discussing the arrest of Claud, and they were heard to remark, "They seem to have it in for us, and we will have to kill some of them." On all the other occasions in which it is claimed the evidence tended to show a conspiracy on the part of the Rhodes brothers, Ed. is not shown to have been present. We believe that all the testimony of acts and declarations of the other Rhodeses, except on such occasions as when Ed. Rhodes, the appellant, was present and participated therein, were inadmissible, because no conspiracy was shown from the antecedent acts and declarations of the par-

ties embracing him. If we look to what occurred on the day of the homicide itself, we fail to see any evidence of a conspiracy. If it is to be considered a conspiracy to bring on a difficulty, it is the most remarkable conspiracy of the kind on record. When the altercation occurred, all the evidence shows that the Rhodeses were totally unprepared for the difficulty. They neither had weapons on them, nor were any weapons arranged or prepared for the difficulty in their place of business, which was near by. As it appears to us, there was unquestionably ill feeling between these parties—the Rhodeses on the one side, and Coleman on the other. It was a general election day. Whether Ed. Rhodes' conduct in hallooing, "Hurrah for Bryan and free silver!" was superinduced by any other motive than political zeal the evidence fails to inform us. It was, however, made the occasion on the part of Coleman (who appears to have been acting as some sort of a peace officer, though his authority is not shown) to threaten to put him in the calaboose; and from this incident an altercation ensued between Coleman and one Ham on one side and Bill Rhodes and Ed. Rhodes on the other. Bill Rhodes told him he was not an officer, and had no right to arrest Ed. Rhodes. He did not claim to be an officer, but merely stated he had been requested to keep the peace. Heated words followed between him and Bill Rhodes. Bill cursed him, and Coleman then knocked him down with his pistol. When he arose to his feet, bleeding profusely, Coleman and Ham had their pistols drawn on him and abused him. At this juncture Mrs. Pool and Ed. Rhodes carried Bill Rhodes into the store of Claud Rhodes, going in at the north door. According to the State's theory, Claud Rhodes at this juncture gave Bill Rhodes a pistol and took one himself. There is no evidence, however, that Ed. Rhodes had anything to do with this matter or was cognizant of it. He and Mrs. Pool tried to prevent Bill Rhodes from returning to the scene of the former difficulty. He succeeded in evading them, and got out at the north door, and the combat with pistols immediately ensued between him and Coleman. There is no pretense that Ed. Rhodes was out there or witnessed any part of this difficulty. The evidence shows that, after the firing began, he made his way out the front door of the Claud Rhodes building, went east, passed the front of Mrs. McCraw's building and the Robertson building, about sixty feet, and thence went north by the Robertson building. He was then armed with a billiard cue. When he appeared the firing had ceased. His brother Bill Rhodes was lying on the ground, shot down. Deceased, Coleman, was leaning against the north wall of the Robertson building, with his pistol in his right hand. Defendant struck him over the head with a billiard cue, and then retired the way he came. This is his participation in the difficulty. If these parties had formed a conspiracy, and intended at that time to bring on a difficulty for the purpose of killing Coleman, evidently they were very poorly prepared for that conflict, and they acted during it without any indications of any concert. So, considering all the testimony of what transpired before and what occurred during the

difficulty, we are not inclined to believe the court was authorized to admit the testimony of declarations of the Rhodeses antedating the difficulty, on the ground that a conspiracy was shown. More than this, the court gave a lengthy charge, predicated on the idea that there was evidence indicating a conspiracy between the Rhodeses to bring on a difficulty with Coleman for the purpose of killing him. These charges on conspiracy were all presented in an affirmative way for the State, and it is complained that the court gave no counter propositions in favor of the defendant. We believe, if the court was authorized to charge on conspiracy at all, that such a charge should have been carefully guarded, and counter propositions, predicated on the nonexistence of a conspiracy, should have been presented on all the issues on that line in favor of the defendant. As it was, we believe that appellant, by the charge of the court, was placed at a decided disadvantage on the issue of a conspiracy, even conceding that the court was authorized to charge on conspiracy.

Appellant also complains that the court charged on his presence at the second difficulty, and participating therein, on the ground that the testimony shows that he was not present at the second difficulty, and did not arrive on the ground until his brother had been killed and deceased mortally wounded; and it is further contended that the court should, at least, have given a counter proposition on this subject, to the effect that, if the jury believed he was not present and did not participate in the second difficulty, knowing the unlawful intent of Bill Rhodes, that he would not be guilty of any offense. Evidently there was an intermission of some minutes between the first difficulty and a renewal of the difficulty in which the homicide occurred—one or two witnesses say as much as five minutes. The testimony shows that appellant knew that his brother, Bill Rhodes, had gone out at the north door evidently for the purpose of renewing the difficulty. Certainly, when appellant heard the firing, he knew that the difficulty had been resumed. About this juncture he went out at the south door of the Claud Rhodes building, and immediately proceeded to the scene of the difficulty, no doubt for the purpose of engaging in it. Now, the proof shows that he traveled from 150 to 170 feet to get to the place where the homicide occurred. During all this time he was out of sight of the combatants, and when he arrived there he found his brother shot down, lying on the ground. The deceased, Coleman, was then standing against the rear of the Robertson building, near the door, and he struck him with the billiard cue, which he had procured, knocking him down. The evidence shows that, when he arrived at the scene of the difficulty, deceased had already received two mortal wounds, and the physicians testified that these wounds caused the death of Coleman, which ensued on the following day. They both testify that the wound on Coleman's head, which was inflicted by appellant, did not fracture the skull; that it was not a mortal wound, though possibly it might have produced death in time. Unquestionably, if Bill Rhodes were on trial for this homicide, in the absence of any proof of a conspiracy between him and others to bring on the difficulty, he would be

guilty of manslaughter, at the least; but does it follow that appellant would have been guilty of the same offense? This would depend on his actual presence and participation at the time the mortal blow or shot was inflicted.   On the other hand, if the mortal wound had been inflicted by Bill Rhodes, while defendant was absent and out of sight of the combatants, he would not be guilty, although Coleman was not dead when he arrived; and this, notwithstanding he may have struck Coleman a blow with a stick, if the wound he gave him was not a mortal wound, and did not at all contribute to his death.   Of course, it will be conceded that if he knew his brother was engaged in a difficulty with Coleman, which would be manslaughter in case he killed him, and he was not present thereat, but was on the way hastening to his assistance, and when he arrived there he found that his brother had already shot Coleman, and that he was then dead, he would be guilty of no offense, although he was hastening to the place of the difficulty to aid his brother. If this be a correct theory, then it follows that if his brother Bill Rhodes and deceased, Coleman, engaged in a difficulty, which would be manslaughter on the part of Bill Rhodes in case he slew Coleman, and that appellant was not present, and, knowing the nature of the difficulty, hastened to the spot to aid his brother therein, and when he arrived at the scene found that a mortal wound had been inflicted on Coleman, but he was not yet dead, and he kicked him or struck him a blow which was not at all mortal, he would not be guilty of manslaughter, though he might be guilty of an assault, because he was not actually present at the difficulty and when the mortal wound was inflicted.   This view of the case was not given in the charge of the court, but the court, after defining manslaughter, merely charged, if Bill Rhodes killed deceased, Coleman. under such circumstances as would constitute the homicide manslaughter, and appellant was present, knowing the unlawful intent of Bill Rhodes, and patricipated therein, that he would be guilty of manslaughter.   The jury, under such a charge, were liable to believe that appellant was present during the entire difficulty—that is, that there was but one continuous difficulty between the parties—and to ignore the fact that there were two difficulties, and that between the first and second difficulty there was an intermission of about five minutes, and that appellant was not actually present at the beginning of the second difficulty, but only appeared on the ground when both of the combatants in that second difficulty had emptied their pistols into each other, and were then hors de combat.   The fact that appellant was near by and hastening to succor his brother, did not render him actually present and responsible for all that his brother did in his absence, no matter what his purpose was in hastening to the scene of the difficulty.   This phase of the case should have been presented to the jury.   It is not necessary to discuss other assignments, but, for the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Hurt, Presiding Judge, absent.