NANCY LUCILE EDGE V. THE STATE.

No. 22165. Delivered June 17, 1942.
State's Motion for Rehearing Denied (Without Written Opinion) October 14, 1942.

The opinion states the case.

*L. A. Wicks,* of Ralls, and *Bradley & Wilson,* of Lubbock, for appellant.

*Spurgeon E. Bell,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant, the wife of the deceased, was convicted of the offense of murder by poisoning, and sentenced to serve five years in the State penitentiary.

The deceased, Dr. C. L. Edge, was a practicing physician in the town of Crosbyton, Texas, and was evidently addicted to the use of alcoholic liquors and narcotics. He seemed to use the drug paregoric possibly as a beverage. The domestic relations between himself and wife were not pleasant, and the friction between them as well as a motivè for the crime is shown by threats upon her part relative to his life. According to a designated accomplice, one George Hardin, appellant had granted Hardin sexual favors and suggested to him the death of Dr. Edge, who was in poor health. It is also shown that she suggested to one J. Stanton that he "knock him (the doctor) on the head." There is also evidence that she had threatened to kill the deceased some time prior to the doctor's death.

George Hardin, the accomplice, testified that at appellant's request he obtained a small bottle of strychnine from one Wooten and gave same to appellant, who had told him she wanted the same to kill a wolf and a dog. Mrs. Edge was in the habit of purchasing paregoric, and sometime prior to the death of the deceased Hardin and appellant went to the town of Lubbock, and appellant went into a drug store there and under an assumed name purchased a vial of paregoric; she then returned to the car where Hardin was, and taking a nail file she dipped it three times into the strychnine bottle and placed the poison in the paregoric just purchased.

On the next day thereafter Dr. Edge was found in a dying condition at his home in the early morning hours, and an examination of his viscera evidenced the fact that there was a scent of paregoric in their contents, and enough strychnine found to evidence that he had taken a lethal dose thereof. As the doctor neared his death, he called to his daughter, who finally came to his bedside, but no statements were shown in the record from him. Appellant, who slept in another portion of the house, came in after the deceased was pronounced dead, and after they had placed the body in the ambulance and taken it away, a State's witness endeavored to sympathize with appellant, and told her he had lost his best friend, and appellant said: " 'I know what killed him,' and I said 'You do,' and she said 'Yes, that durned paregoric,' and I said: 'He told me he had quit that,' and she made the remark 'He was a damn liar.' " This witness also testified to some harsh words passing between the appellant and deceased two days before the doctor's death relative to money matters.

While we find the presence of a motive, and possibly malice exhibited toward the deceased by appellant, as well as a well defined desire to get rid of him, outside of the evidence of Hardin, the accomplice, there is no proof relative to the mixing of the poison in the paregoric, which of course is the crucial point in the case. The toxicologist does testify that he "scented" paregoric in the viscera, as well as found strychnine therein, but he had no means of telling whether the poison was mixed in the paregoric or not; he thought they were probably taken at about the same time, but there being but a scent of paregoric, he could not tell whether the poison was in solution in the paregoric or not. No one else save the confessed paramour and accomplice testified to the placing of the poisonous substance in the paregoric, although the paregoric itself is shown to have been purchased by appellant under the false name of "Mary Brown" by the druggist at Lubbock.

The gist of this offense is not only the placing of the poison in the paregoric, but also the placing of the paregoric in such a place that the deceased would swallow the same and thus cause his death. The record shows naught as to what was done with the paregoric after the poison had been placed therein, and we have no other testimony as to the poison being placed therein save that of the accomplice. No poison was placed in appellant's hands save by the testimony of the accomplice, and although there is in evidence certain testimony of other than accomplice witnesses that would be and should be damaging to appellant's reputation, and would evidence a certain degree of depravity not looked for nor expected from one in her station and attainments in life, nevertheless such testimony, while evidencing the fact that she is probably a person who would commit such a crime as herein charged, does not reach the height of a corroboration of the testimony of the admitted accomplice.

We think the trial court was correct in refusing to admit in evidence the testimony relative to the conviction of Hardin, the accomplice, some eighteen or nineteen years ago. While there was much testimony from Hardin that evidenced a lack of any reformation during such a long lapse of time, we do not feel warranted in saying that such an old offense, without any lapse between, would be admissible as affecting his credibility.

We do think bill of exceptions No. 10 evidences error. The doctors testified that death stops all absorption of matters contained in the stomach. That the poison, if any, found in a human stomach after death could not cause death; that the ravages of the poison would be found in the kidneys and liver. It was shown that in the examination of the viscera of the deceased the toxicologist only utilized the stomach in conducting the analysis, and did not analyze the kidneys nor the liver, but found evidence of a deadly dose in the residue remaining in the stomach. It was also shown by the doctors that strychnine caused a convulsive death and an early rigidity of the body after death, as well as certain other matters characteristic of a strychnine death.

Appellant offered the testimony of Dr. E. L. Haney, a practicing physician, who had known the deceased for a number of years intimately, who had observed deceased's conduct, had consulted with him relative to his habits as to drinking liquor as well as the use of narcotics, and was familiar with the deceased's state of. health, and who would have testified, if allowed to do so, that deceased's body gave no evidence of strychnine poisoning, but that in his opinion Dr. Edge died from a heart attack superinduced by the use of narcotics and alcoholic liquors. Of coure if Dr. Haney's proffered testimony was true, such would go far in exculpating appellant. The witness himself stated that he did not base his opinion on the casual examination of the deceased's body alone, but that same was aided greatly by the knowledge of the deceased and his habits during lifetime as well. We think the same was admissible, the objections thereto affecting possibly the weight of the testimony rather than its admissibility.

We are cited to the case of Baker v. State, 16 S. W. (2d) 248, and find a case strikingly similar in many respects to the instant case. That case was reversed on motion for a rehearing on the facts, and we find the following quotations therein:

. "From Wharton on Homicide (3d Ed.) p. 156, the following quotation is taken: 'And while, in a prosecution for homicide by poison, the symptoms and appearances during the last illness become controlling facts in determining whether the death was from poison or from disease, the charge is not made out unless the prosecution negatives everything but poison as the cause of death; and this can only be done by showing affirmatively that the combined symptoms, and the absolutely certain

facts with which they are associated, as inconsistent with any other disease or ailment.'

"From Wharton's Criminal Evidence (10th Ed.) vol. 1, Par. 328, we quote as follows: 'Where poison has been administered, death may result from natural causes, and the burden is on the prosecution to show beyond a reasonable doubt that the poison thus received into the system was the cause of death.'

"From the same text (volume 2, Par. 787) the following quotation is taken: 'The disease of which the deceased died may not have been induced by poison, since there are few symptoms attendant on poisoning which are not also attendant on certain types of natural disease'."

For the lack of corroboration of the accomplice, as well as for the error set forth in bill of exceptions No. 10, this judgment is reversed and the cause remanded.