Stanley WRIGHT, Appellant,

v.

The STATE of Texas, Appellee.

No. 37690.

Court of Criminal Appeals of Texas.

March 10, 1965.

Rehearing Denied April 21, 1965.

M. Herbert Oldham, Beaumont, for appellant.

W. C. Lindsey, Dist. Atty., John R. DeWitt, Asst. Dist. Atty., Beaumont, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Judge.

The offense is murder with malice; the punishment, five years.

The indictment alleged that appellant voluntarily and with malice aforethought killed Martin Garlaska by shooting him with a pistol.

The jury rejected appellant's plea of self-defense and accident and his plea for suspended sentence.

The offense of assault with intent to murder was submitted to the jury, coupled with instructions to acquit appellant of murder if they had a reasonable doubt that the injury inflicted upon the deceased by shooting him with a pistol caused his death.

The undisputed evidence shows that appellant shot the deceased in the back with a pistol. The sufficiency of the evidence to sustain the jury's finding that the shot was fired voluntarily, and not in self-defense, is not challenged.

The shooting occurred at the Oyster Bar on May 12, 1961. There was evidence that a few hours earlier at Rich's Club, the deceased was assaulted and beaten by appellant.

There is also evidence to the effect that the deceased was stomped or received a blow in the abdomen.

Dr. William L. Sheehan, whose qualifications as a licensed physician were stipulated and who attended the deceased from July 1 to his death on July 19, 1961, at the Veterans Hospital in Houston, testified that in his opinion: "* * * Martin Garlaska died of a gastro intestinal hemorrhage from an ulcer that had been produced by his injury occurring some two months prior to his death."

He further testified, in part:

"Q. * * * without the gunshot wound in question, in your opinion, would this man have died from this bleeding gastric ulcer, would the ulcer have come about?

"A. Without the injuries sustained there would have been no precipitating stress to produce the ulcer."

On cross-examination:

"A. If I might quote my summary. History of the patient. Patient after his arrival indicated that he was shot by an unknown assailant and then stomped in the abdomen. Patient stated that he did not know his assailant and had never seen him before or since."

On re-direct examination:

"Q. Doctor, you filled out as part of your report there—you filled out the death certificate and as related in your initial testimony the series of steps—you got a series of steps that in your opinion caused his death?

"A. Well, the immediate cause was bleeding.

"Q. All right. Gastrointestinal hemorrhage?

"A. From his ulcer.

"Q. * * * Which you said was due to what?

"A. Debilitation and malnutrition.

"Q. Which, in turn, you said was due to what?

"A. The gunshot wound and the abdominal trauma.

"Q. Both?

"A. Both.

"Q. Absent the gunshot wound it would have been unlikely he would have died from—

"A. Well, absent the gunshot wound if this man perforated an intestine symptoms of this would have been manifest within minutes.

"Q. In your opinion, doctor, to sum it up; you say that definitely a man with a wound of this nature knowing that he was paralyzed would have severe emotional stress?

"A. Correct.

"Q. Which would be a contributing factor to the gastric ulcer which ultimately resulted in killing him?

"A. Right.

*   *   *   *   *   *

"A. He died from the bleeding ulcer."

The gunshot wound was described by Dr. Jack Orrick, Jr. who attended the deceased from May 12 to May 25, 1961, when he was transferred to the Veterans Hospital in Houston, as: "* * * an entrance wound of a bullet or a missile on the back area just to the right side of his left shoulder blade. * * * the right side of the chest * * * was full of either air and or blood. There was a second exit-type wound in the right chest at about the level with the third rib just on the front lateral part of the chest, * * *."

Dr. Orrick further testified:

"Q. What was the initial procedure there at the hospital as to whether any exploratory surgery was done or what was done there that night?

"A. The first thing we did after starting his * * * transfusions and getting set up to replace his blood loss, I put a chest tube into the right side of the chest in the emergency room and over of a period of our observation down there in the emergency we pulled off into the chest tube approximately two quarts of blood out of the right side of his chest. There was evidence that the bleeding was continuing from that side of the chest as the level of the bottle kept rising. It was on the basis of these injuries we were going on ahead to open the chest at that time. Now in our further examination down in the emer-

gency room it was noted that he was not moving either of his lower extremeties, his legs, and then in checking up and down we found that there was no sensation at all and no movement at all below the level of approximately the third rib of the chest. There was no movement in either leg and no sensation below the upper part of the chest. So, we were afraid there had been damage to the spinal cord at a high level. We took him to surgery after he had gotten out of shock initially and opened the right side of his chest. We found that the upper lobe of the right lung was pretty well splintered—a two-inch wound on one surface and three inches on the other, and then there were fragments of the body vertebrae or the backbone around the third and fourth *backbone*, which had been driven into the right lung itself. We removed approximately another quart of blood from the right side of the chest. We took the bone fragments out of the right lung, controlled the bleeding and repaired the right lung and drained the chest and closed it. Then at that point we turned him over and Dr. Faulk, Dr. Ed. Faulk, then did a maninectomy or made an incision of the upper part of the chest over the vertebrae and we went down to the spinal cord in the area of the injury to see if there was anything correctible. The track of the missile was found to have passed directly through the spinal cord; it had essentially destroyed the spinal cord at the third and fourth level completely. So, other than the removal of the bone fragments and some blood clots there was nothing further that we could do at that time."

On cross-examination:

"Q. And a gastric ulcer would not have been caused by the bullet wound, would it?

"A. You mean immediately?

"Q. Yes, sir.

"A. Not immediately, no. Of course, if you want to project it out into a period of time you can produce ulcers, can and frequently do, as a result of massive injury, massive producing shock, steroid cortisone usage can produce ulcers of the stomach.

"Q. But that's over a period of time?

"A. This will develop generally during the time of treatment.

"Q. Over how long a period, doctor?

"A. It can appear in a few days.

* * * * * *

On re-direct:

"Q. Now you said in this cross-examination that a massive injury of this type can and frequently does produce gastric ulcers in a patient that has suffered such a massive injury as this patient suffered?

"A. This condition—what we run into, what we call stress ulcers, and this is the type thing that we were speaking about or leading into—a person who either has been critically injured or has critical illness, even, they will—they are in very dire straits, certainly one who has been in shock or infection and under a lot of steroid cortisone treatment, all of these things can produce ulcers in the intestinal tract and we get into that every once in a while, yes, sir.

"Q. As to the peritonitis and gangrene, you have stated that was not directly, in your opinion, the—connected with—that is, not directly connected, caused by the bullet wound?

"A. No, sir. The bullet did not cause that, no, sir.

There is evidence to the effect that the deceased died of a gastro-intestinal hemor-

rhage from an ulcer caused by physical injuries, psychological shock and severe emotional stress from deceased's awareness of his injury and his paralysis, which resulted from the gunshot wound, and that the gunshot wound could have been and probably was a contributing factor to the peritonitis-gangrene in the lower colon in that the patient's paralysis caused by the gunshot wound rendered an early detection and prevention of the condition impossible, thereby allowing it to become very serious before it was detected.

Appellant challenges the sufficiency of the evidence to sustain the allegation of the indictment that appellant killed Martin Garlaska by shooting him with a pistol. His position is that the state failed to negative the probability that the deceased was "traumatized" by being "stomped in the belly" causing peritonitis which in turn brought about the bleeding ulcer.

Art. 1201 P.C. provides: " 'Homicide' is the destruction of the life of one human being by the act, agency, procurement, or culpable omission of another."

Art. 1202 P.C. provides: "The destruction of life must be complete by such act, agency, procurement or omission; but although the injury which caused death might not under other circumstances have proved fatal, yet if such injury be the cause of death, without its appearing that there has been any gross neglect or manifestly improper treatment of the person injured, it is homicide."

■ The destruction of life must have been occasioned by the act of appellant, but appellant is responsible if his act of shooting contributed to the death, though there were other concurring causes. Tomerlin v. State, Tex.Cr.App., 26 S.W. 66; Rhodes v. State, 39 Tex.Cr.R. 332, 45 S.W. 1009; Ex parte Pettis, 60 Tex.Cr.R. 288, 131 S.W. 1081.

If the act of the defendant alleged in the indictment contributed to the death of the deceased he is responsible though there were other concurring causes. 29 Tex.Jur. 2d, Sec. 67 and 68. See also Adams v. State, 150 Tex.Cr.R. 431, 202 S.W.2d 933.

■ As we view the evidence, there is none which would warrant a finding that Martin Garlaska died from causes arising independent of the gunshot wound and the evidence refutes any suggestion of neglect or improper treatment. On the other hand, the evidence is deemed sufficient to show that the gunshot wound, which severed the spinal cord and resulted in paralysis of the lower part of the body, was a cause and factor in all of the complications and a moving and efficient cause of death. See Miers v. State, 157 Tex.Cr.R. 572, 251 S.W.2d 404; Hill v. State, 108 Tex.Cr.R. 489, 1 S.W.2d 639; Franklin v. State, 137 Tex.Cr.R. 136, 128 S.W.2d 389; Wilson v. State, 136 Tex.Cr.R. 590, 126 S.W.2d 977; Grayson v. State, 106 Tex.Cr.R. 251, 291 S.W. 908; Wilson v. State, Tex.Cr. App., 24 S.W. 409; Moore v. State, 126 Tex.Cr.R. 391, 71 S.W.2d 531; Duque v. State, 56 Tex.Cr.R. 214, 119 S.W. 687; Embrey v. State, 94 Tex.Cr.R. 591, 251 S.W. 1062.

Edge v. State, 144 Tex.Cr.R. 480, 164 S.W.2d 677, does not sustain appellant's contention to the contrary. In that case there was evidence of an independent cause of death.

The judgment is affirmed.