

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00479-CR

| | | |
|---|---|---|
| James Howard Adams II | § | From Criminal District Court No. 4 |
| | § | of Tarrant County (1183507D) |
| v. | § | February 14, 2013 |
| | § | Opinion by Justice Walker |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Sue Walker



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-11-00479-CR

JAMES HOWARD ADAMS II                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

## FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

Appellant James Howard Adams II appeals his conviction for the murder of Corley McKelroy. In two issues, Adams contends that the evidence is insufficient to support his conviction. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

Richard Anderson frequently traveled to Mexico to buy pills without a prescription. On one trip, he took Adams and Nick Panzera, and the three purchased Valium, Xanax, and Rohypnol. Upon their return to Fort Worth, they went to a warehouse occupied by McKelroy as a residence. Anderson told Adams and Panzera that he was going to purchase more drugs from McKelroy.

Anderson went inside, and the other two men waited outside. During the drug transaction, Anderson used his .380 caliber pistol to shoot McKelroy multiple times in his chest, back, and right arm. Adams and Panzera heard gunshots and ran into the warehouse. Anderson then ordered Adams to shoot McKelroy. At Adams's trial, Anderson testified that the purpose of his instruction was to form a pact with Adams and Panzera because Anderson thought that "if everybody shot [McKelroy] then nobody could tell." Panzera testified that Anderson's instruction served to make sure that McKelroy was in fact dead. Adams testified that Anderson simply demanded that Adams "put one in [McKelroy]." While the testimony from the three men varied as to Anderson's precise instruction, each testified that Adams used a shotgun to fire a single gunshot into McKelroy's head.

The shot from Adams's gun was so loud that the men thought someone might have heard it, and they left immediately.[2] Anderson drove McKelroy's car,

---

[2]Anderson testified that because the gunshot was so loud, he decided to forgo Panzera's turn to shoot McKelroy and complete the pact.

3

and Adams and Panzera followed in their vehicle. They drove to a lake, set McKelroy's car on fire, and then drove to a nightclub in their vehicle.

Adams was charged with first degree murder. The jury convicted him and assessed his punishment at thirty years' confinement. The trial court sentenced him accordingly.

### III. SUFFICIENCY OF THE EVIDENCE

In two issues, Adams argues that the evidence is insufficient to prove (1) that McKelroy was alive when Adams fired the gun and (2) that Anderson, rather than Adams, murdered McKelroy.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364

4

S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903.

### B. Sufficiency of Evidence to Show that McKelroy was Alive When Adams Fired His Gun

In his first issue, Adams argues that the evidence is insufficient to show that McKelroy was alive when Adams fired his gun because the evidence at trial showed that the first gunshots fired by Anderson killed McKelroy.

A person commits murder if he (1) intentionally or knowingly causes the death of an individual or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1)–(2) (West 2011). "Individual" means a human being who is alive. *Id.* § 1.07(a)(26) (West Supp. 2012). "Death" occurs when, according to ordinary standards of medical practice, there is irreversible cessation of the person's spontaneous respiratory and circulatory functions. Tex. Health & Safety Code Ann. § 671.001(a) (West 2010); *see also Grotti v. State*,

273 S.W.3d 273, 282 (Tex. Crim. App. 2008) (explaining that the health and safety code definition of "death" is appropriate in reviewing the sufficiency of the evidence using hypothetically correct jury instructions).

At Adams's trial, the jury heard expert testimony from two medical examiners who both opined that McKelroy was alive when Adams fired his gun. The State first called Dr. Stephen Putthoff. Dr. Putthoff was a deputy medical examiner with the Tarrant County Medical Examiner's Office when McKelroy was killed. He performed the autopsy on McKelroy. According to Dr. Putthoff, the gunshots from Anderson's pistol were lethal, meaning that McKelroy would have eventually died because of them. Dr. Putthoff did testify, however, that McKelroy was alive before receiving the single gunshot to his head. Dr. Putthoff explained that the gunshots fired by Anderson

> eventually would have been fatal because [McKelroy] was bleeding into both lungs and the center compartment of the chest . . . . He would have eventually gone into shock. I mean, terminal shock. But what I found in doing the autopsy was that he had lived long enough to go into blood loss shock . . . . So those initial shots did not kill him.
>
> The shunning phenomenon known as shock occurs quite quickly, less than a minute or so. But it does show there was an interval of time between those large caliber handgun bullets and the head shot.

Dr. Putthoff further testified that McKelroy's kidneys demonstrated signs that he was not dead but was "shunning" due to the blood loss shock. Dr. Putthoff explained:

6

The kidneys are one of the first organs to show the shunning phenomenon. What the body is essentially trying to do is deal with all this blood loss and keep what the body considers the most important organs alive. . . . Well, the kidneys are evolutionary and by choice of the body evidently expendable. So they start—the kidneys show first evidence of that shunning phenomenon because the outer layer of the kidney . . . becomes very pale. The blood is actually being diverted from the kidneys.

Based on the autopsy results, Dr. Putthoff concluded that McKelroy's heart was still beating when Adams fired his gun.

The State also called Dr. Nizam Peerwani, Chief Medical Examiner of Tarrant County. Like Dr. Putthoff, Dr. Peerwani testified that in his opinion, McKelroy was alive when Adams fired the gun into McKelroy's head. Dr. Peerwani based his opinion on photographs taken at the crime scene and during the autopsy—both of which displayed that McKelroy had hemorrhaging in the orbits of his eye sockets. Dr. Peerwani explained the significance of this hemorrhaging:

These are—are usually called raccoon eyes, and they usually are seen in a person who has been shot in the head. But to have those raccoon eyes or hemorrhage around the orbits of eye sockets, one has to have a beating heart. You can't have that in a—in a dead person.

. . . . For black eyes to occur you [need] to have a beating heart. So whether he was alive for a short while or he lingered on, the point of—the fact of the matter is that his heart was still beating when he sustained the gunshot wound.

Dr. Peerwani testified to his belief that McKelroy's heart was still pumping when Adams shot McKelroy; as such, McKelroy had not yet experienced an irreversible

7

cessation of his circulatory functions when Adams shot McKelroy. *See* Tex. Health & Safety Code Ann. § 671.001(a).

Counsel for Adams asked both Dr. Putthoff and Dr. Peerwani on cross-examination whether an alternative means, such as a blow to the face occurring before the shooting, could have caused the hemorrhaging around McKelroy's eyes. Dr. Putthoff responded that his analysis uncovered no evidence of the kind of soft tissue injuries that would result from a pre-gunshot blow to the skin; rather, the hemorrhaging was consistent with a gunshot wound. Dr. Peerwani also explained that McKelroy's hemorrhaging was inconsistent with a pre-gunshot facial blow: "Generally speaking, when you have a black eye, there's also hemorrhage in the conjunctiv[ae] of the eyelids inside, and there is hemorrhage in the—in the covering of the eyeballs, which is the orbital conjunctiv[a]. [McKelroy] had none of those things present." Dr. Peerwani said that a pre-gunshot blow could possibly cause the hemorrhaging around McKelroy's eyes but was improbable here when considered in connection with the amount of hemorrhaging in McKelroy's brain:

> There was a lot of bleeding in the brain. A person whose heart does not beat does not bleed so profusely. Like I said a little while back, we remove the brain from the skull in a postmortem exercise, and there's nothing more traumatic than taking a brain out. There isn't such blood that you see throughout the brain because of the process. You [have] to have a beating heart to have this enormous amount of hemorrhage that you see in this case.

Despite the above testimony, Adams argues that the overwhelming evidence shows that McKelroy was dead when he received the gunshot to the

8

head.  In support of his claim, Adams points to the eyewitness testimony of Anderson and Panzera and the expert testimony of Dr. Charles Harvey, who all testified that McKelroy was dead when Adams fired his gun.

But the jury, as factfinder, has the responsibility of judging the credibility of witnesses and assigning weight to the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Wise*, 364 S.W.3d at 903.  In the present case, after judging the credibility of the witnesses and assigning weight to the evidence, the jury favored the testimony of Dr. Putthoff and Dr. Peerwani over the evidence put on by Adams, and the jury concluded that McKelroy was alive when Adams fired his gun.  Viewing the evidence in the light most favorable to that verdict, we conclude that a rational jury could have found beyond a reasonable doubt that McKelroy was alive when Adams fired his gun.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638; *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).  We overrule Adams's first issue.

### C.  Sufficiency of Evidence to Show that Adams's Gunshot was a "But For" Cause of McKelroy's death

In his second issue, Adams argues that the evidence is insufficient to show that he murdered McKelroy because the evidence shows that Anderson alone is responsible for McKelroy's death, thus excusing Adams from culpability.

A person is criminally responsible for murder if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result

9

and the conduct of the actor was clearly insufficient. Tex. Penal Code Ann. § 6.04(a) (West 2011). The Texas Court of Criminal Appeals has interpreted section 6.04(a) to mean that

> a "but for" causal connection must be established between the defendant's conduct and the resulting harm. If concurrent causes are present, two possible combinations exist to satisfy the "but for" requirement: (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause; or (2) the defendant's conduct and the other cause *together* may be sufficient to have caused the harm. However, [section] 6.04(a) further defines and limits the "but for" causality for concurrent causes by the last phrase, "unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." If the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's conduct, by itself, is clearly insufficient, then the defendant cannot be convicted.

*Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).

In the present case, sufficient evidence supports a jury determination that McKelroy's death would not have occurred but for Adams's actions. Dr. Putthoff testified that the gunshot to McKelroy's head left an entry wound of 3.5 by 2.5 inches, which Dr. Putthoff described as a "huge" wound, and an exit wound of 5 by 4 inches. Additionally, Dr. Putthoff testified that the gunshot to McKelroy's head caused two-thirds of his brain to be blown out. Dr. Peerwani, on cross-examination, explained that Anderson's gunshots were indeed lethal but the final gunshot to the head was fatal—the shot that caused McKelroy's death.

In support of his argument that the evidence is not sufficient, Adams relies on two cases: *Wright v. State*, 388 S.W.2d 703, 706 (Tex. Crim. App. 1965), and

10

*Hutcheson v. State*, 899 S.W.2d 39, 41 (Tex. App.—Amarillo 1995, pet. ref'd). These cases, however, offer little to support Adams's argument that because Anderson may be culpable of McKelroy's death, Adams is thereby relieved of culpability. The cases cited address only the culpability of the initial actor and offer nothing to remove criminal responsibility from the secondary actor. *See Wright*, 388 S.W.2d at 706; *Hutcheson*, 899 S.W.2d at 41. In *Wright*, the court of criminal appeals actually stated that when a criminal defendant "contributed to the death of the deceased he is responsible though there were other concurring causes." *Wright*, 388 S.W.2d at 706; *accord Robbins*, 717 S.W.2d at 351 (interpreting Texas Penal Code section 6.04). Thus, so long as Adams's gunshot was itself sufficient to cause McKelroy's death, the fact that Anderson's gunshots may have also been sufficient to cause the death is wholly irrelevant.[3] *See Wright*, 388 S.W.2d at 706.

Viewing the evidence in the light most favorable to that verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Adams's act was a "but for" cause of McKelroy's death. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638; *Matson*, 819 S.W.2d at 846. We overrule Adams's second issue.

---

[3]Adams also argues that because Anderson directed him to shoot McKelroy, the culpability should be on Anderson alone. Adams cites no authority for this proposition. Even if he had raised the affirmative defense of duress at trial, we find no support in the record for it. *See* Tex. Penal Code Ann. § 8.05 (West 2011) (setting forth elements of duress).

11

## IV. CONCLUSION

Having overruled Adams's two issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  WALKER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 14, 2013